**FILED**

Aug 31 2018, 9:09 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Victoria Bailey
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

Steven J. Halbert
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
INDIANA DEPARTMENT OF
CHILD SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Katherine A. Cornelius
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE CHILD
ADVOCATES, INC.

DeDe K. Connor
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of A.R. and H.R., Children in Need of Services, | August 31, 2018 |
| J.R., Father, | Court of Appeals Case No. 18A-JC-475 |
| *Appellant-Respondent,* | Appeal from the Marion Superior Court |
| v. | The Honorable Marilyn A. Moores, Judge The Honorable Rosanne Ang, Magistrate |
| Indiana Department of Child Services, | Trial Court Cause No. 49D09-1706-JC-1915 49D09-1706-JC-1916 |
| *Appellee-Petitioner,* | |

and

Child Advocates, Inc.,

*Co-Appellee (Guardian ad Litem).*

**Kirsch, Judge.**

[1] J.R. ("Father") appeals the juvenile court's order adjudicating two of his children, A.R. and H.R., to be children in need of services ("CHINS"). Father raises three issues for our review, which we consolidate and restate as follows:

> I. Whether the juvenile court had jurisdiction to enter a CHINS adjudication and disposition;
>
> II. Whether the Indiana Department of Child Services ("DCS") presented sufficient evidence that A.R. and H.R. were CHINS.

[2] We reverse.

## Facts and Procedural History

[3] M.R. ("Mother") and Father are the parents of five children, including A.R., born in Henderson County, North Carolina in April 2005, and H.R., born in

Lafayette, Indiana in March 2012.[1]  In 2014, parents were living together and with the children, in North Carolina.  In September 2014, the North Carolina Department of Social Services ("NCDSS") removed the children from the home and filed a juvenile petition, similar to what would be a CHINS petition in Indiana, as to the five children, alleging unstable housing, substance abuse by parents, and domestic violence between parents.  In March 2015, the children were adjudicated as abused and neglected juveniles.  *Pet'r's Exs*. 1, 2, 3, 4.  From September 2014 until sometime in 2016, the children were in the care and control of NCDSS.

[4]  Following a May 2016 review hearing, the North Carolina juvenile court issued a Subsequent Permanency Planning and Review Order on July 15, 2016 ("July Review Order").  The July Review Order reflected testimony of social worker William Winters ("SW Winters") that Mother completed her case plan and that Mother wanted to move to Indiana.  SW Winters also testified that Father had multiple failed drug screens, but paid child support, visited regularly, was employed, and was bonded with the children.  *Id*.  The North Carolina juvenile court awarded custody of the five children to Mother, granted Father supervised visitation, to be supervised by specified maternal and paternal family members, and closed the CHINS proceedings.  *Pet'r's Exs*. 1, 2.  The July Review Order also stated that North Carolina "retains jurisdiction in this matter

---

[1] The other three children were each born in North Carolina, in 2006, 2007, and 2010.

until terminated by order of the Court" or until the children reach the age of majority. *Id.*

[5] At or around the end of the school year in 2016, Mother left North Carolina with all five children. However, after a period of time, she and the children returned to North Carolina, where they lived in a separate residence from Father. At some point, three of the children moved in with Father. At the end of April 2017, Mother returned to Indiana with A.R. and H.R., the two children who were not living with Father and are the subject of the current CHINS case.

[6] In May 2017, NCDSS received reports of an "injurious environment" at Father's home and, in response, it filed on June 23, 2017 a Motion to Re-Open and to Review the previously closed CHINS matter. NCDSS conducted an investigation of Father's residence and his girlfriend, with whom he lives. Social worker Vanessa Phillips ("Phillips") found no evidence of abuse or neglect, Father took and passed all drug screens, and had started attending a substance abuse group. *Pet'r's Ex.* 3. The NCDSS asked the North Carolina juvenile court to approve the three children living with Father and remove the previously-ordered supervised visitation. *Id.* The Motion to Re-Open also reflected that NCDSS made a report to DCS, "who initiated [its] own investigation." *Id.*

[7] Here in Indiana, Mother was uncooperative with DCS's investigation throughout May. DCS was investigating reports of housing instability and that

at least some of the children missed school because Mother was out at bars and did not return home, Mother allowed A.R.'s fourteen-year-old boyfriend to sleep over and have sex with A.R., Mother had sex in front of the children in the same room, Mother used drugs in front of the children, and Mother left children with inappropriate caregivers, one of whom overdosed. *Pet'r's Ex.* 3; *Appellant's App. Vol. II* at 48. On June 14, 2017, police were dispatched to Mother's home on reports of domestic violence, and she again was uncooperative and untruthful with officers. A.R. and H.R. were removed from Mother's home, and on June 15, 2017, DCS filed a CHINS petition as to A.R. and H.R., alleging that Mother failed to provide them with a safe, stable, and appropriate living environment free from domestic violence and substance abuse and that the children were not attending school. *Appellant's App. Vol. II* at 45. As to Father, the Petition alleged, "[Father] . . . has not successfully demonstrated an ability and willingness to appropriately parent the children, and/or they are unable to ensure the children's safety and well being while in the care and custody of [Mother] as he is in North Carolina." *Id.*

[8] The intake report reflected that a DCS family case manager ("FCM") had contacted Father, who told her that he would like A.R. and H.R. to be placed with him. *Id.* at 50. Father was advised of the upcoming Indiana court date and said he would attempt to be present. Another FCM from Indiana had spoken with the North Carolina social worker Phillips, who stated that there were "no immediate concerns" with Father, that he was "actively engaged" in services, he completed a substance abuse assessment, but "was not able to

produce a urine sample" for his most recent screen, but that NCDSS "plans to follow up with [Father] to complete a hair follicle test and urine drug screen." *Id*. Phillips said that if there were no concerns with those drug tests results, North Carolina "does not have any immediate concerns with the children returning to [Father's] care so long as he continues to abide by the court order which requires his contact be supervised." *Id*. at 51. The juvenile court continued the initial hearing, placed A.R. and H.R. in foster care, and appointed court-appointed special advocate Greg Huff ("CASA Huff"). The juvenile court also appointed a guardian ad litem ("GAL"). *Id*. at 61-63.

[9] Father was present at the June 29, 2017 continued initial hearing, and he was present by telephone at the July 6, 2017 pretrial hearing. At the pretrial, DCS reported that A.R. and H.R. "would like to live with" Father and that, according to NCDSS (1) Father and his girlfriend are appropriate with the children, (2) Father was participating in services, and (3) the North Carolina CHINS case "will be closing soon." *Id*. at 84-90. Father was also present at the next pretrial, on July 20, 2017. DCS objected to Father having temporary trial visitation ("TTV") with A.R. and H.R., noting that there was still an open CHINS case in North Carolina[2] and that DCS would like to have an ICPC[3] to

[2] DCS stated at the July 20 pretrial conference that North Carolina had filed a CHINS petition against Father for substance abuse, but DCS later filed a report with the juvenile court clarifying that the pleading filed in North Carolina was actually the Petition to Reopen and Review, which reported to that court that three children were living with Father because of housing instability with Mother and the children "not knowing where they would sleep at night." *Appellant's App. Vol. II* at 104.

[3] ICPC refers to Interstate Compact on the Placement of Children. This court has held that the ICPC "does not apply to placement with an out-of-state parent[,]" and, pursuant to statute, it only applies to the

be completed.  The GAL requested that any ICPC be completed soon so that A.R. and H.R. "can be placed on TTV with Father as soon as possible." *Id*. at 92.  The juvenile court denied Father's request for TTV at that time.

[10]  A fact-finding hearing began on July 27, 2017, and it continued for two subsequent evidentiary hearings, on October 11 and November 30, 2017.[4] Father was present for all three hearings.  At the July 2017 hearing, Father's counsel requested placement of A.R. and H.R. with Father, stating that North Carolina had found Father's residence to be appropriate for the other three siblings that were living with Father.  Counsel for DCS objected to immediate placement with Father, stating that at a mediation that had taken place a week prior, Father had tested positive for oxycodone, and that "I'm not sure if North Carolina knows that or not. . . .  I'm kind of questioning whether they have all the information they need to make [a] determination as to whether father's home is safe or not." *Tr. Vol. II* at 10.  Father's counsel responded that Father took a screen "today," and it was "clean" and that Father and his counsel did not receive a copy of a "dirty screen" and requested a copy. *Id*. at 10-11.  The juvenile court denied Father's request for immediate placement on TTV.  The juvenile court stated, "I'm still worried a little bit about [F]ather.  I'm glad the kids want to see [him], so that's a step in the right direction[,]" but "[u]ntil I'm

---

placement of a child in foster care or as a preliminary to a possible adoption. *Matter of B.L.P.*, 91 N.E.3d 625, 630-31 (Ind. Ct. App. 2018) (expressing concern that "notwithstanding this unambiguous holding, apparently DCS is still requesting – and trial courts are still granting – ICPC evaluations for out-of-state parents.").

[4] We note that no evidence was presented at the July 27, 2018 hearing; it was brief and consisted only of argument by counsel.  Evidence was presented at the two subsequent hearings.

confident that there's an appropriate place I'm not willing to order any changes[.]" *Id*. at 11. Father later filed a motion requesting that the North Carolina FCM, Rebecca Johnson ("NC FCM Johnson"), be permitted to testify telephonically, which request the juvenile court granted.

[11] Between the July 2017 hearing October 2017 fact-finding hearing, the North Carolina juvenile court issued a Review Order on September 28, 2017 ("September 2017 Review Order"). In it, the court recognized that Father had attended four Strong Fathers classes, in a twenty-week program, with Father reporting that he missed some weeks due to traveling to Indiana for court hearings, and the court expected Father "to attend the remaining weeks without further absences." *Pet'r's Ex*. 4. It also recognized that Father had completed a comprehensive clinical assessment, which recommended participation in a substance abuse group and for Father to attend Narcotics Anonymous. The assigned social worker would be working with Father and his girlfriend to arrange in-home therapeutic services for the three children living with them. The GAL said that the three children living with Father were doing well, felt safe, wanted to stay there, and wanted all five siblings back together. *Id*. The NCDSS required that, if Mother were to return to North Carolina, her visits with the children be supervised, she report to NCDSS, and she complete an assessment and recommended treatment. The September 2017 Review Order concluded: (1) the three children living with Father "remain in the custody of [Mother] and in the home of [Father]"; (2) Father's visitation with the three children no longer be supervised; (3) Father complete the programs and services

and "remain drug free," (4) Father work with NCDSS to enroll the three children living with him in therapeutic services, (5) Mother comply with the Indiana juvenile court's order and, if she returns to North Carolina, she complete an assessment and services, and (6) a copy of the September 2017 Review Order be sent to the Indiana juvenile court "as soon as executed." *Id.*

[12]  Thereafter, at the October 11, 2017 fact-finding hearing in Indiana, Father and his girlfriend, Bethany Byars ("Byars"), with whom Father lived, were present. At the beginning of the hearing, the juvenile court stated that it had just been advised that Father had "open warrants" from "other courts," and Father was taken into custody at that time. *Tr. Vol. II* at 14; *Appellant's App. Vol. II* at 125-27. Counsel for Father had not been aware of the existence of the open warrants. Before the start of evidence, Mother admitted that A.R. and H.R. were CHINS, stating, "[Mother] would benefit from services in order to maintain sobriety. Therefore, coercive intervention of the Court is necessary." *Id.* at 16-17. Thereafter, the juvenile court proceeded with fact-finding as to Father, and DCS first called Lauren Turley ("Turley"), an assessment worker with DCS.

[13]  Turley stated that, in May 2017, DCS filed a CHINS petition as to A.R. and H.R., in response to allegations of lack of supervision, not attending school, concerns with Mother abusing substances, and A.R. having an inappropriate physical relationship with someone older than her. Turley had trouble locating Mother and when she did locate her, Mother would not let Turley speak to A.R. and H.R., requiring DCS to file a motion to compel. In the course of her

investigation, Turley spoke to NCDSS after learning from Mother that there was an open CHINS case in North Carolina. However, Turley testified that she never looked at the petition and did not have information as to why the case was opened. After A.R. and H.R. were removed from Mother's care, Turley spoke with Father, to advise him about "the situation" that was going on with A.R. and H.R. *Tr. Vol. II* at 23. Father explained to Turley that he was in North Carolina and, as to whether he was satisfied with A.R. and H.R.'s being in Mother's care, he told Turley that "[h]e wanted the children in his care." *Id.* at 25. In their conversation, Father told Turley that he was not sure if he would have transportation to Indiana because he relied on his mother for transportation and, he shared, that he relied on her "for supervising his contact with his children." *Id.* at 23. Turley did not recall being told or learning why visitation was supervised. Turley said the CHINS filed against Mother was later substantiated, and A.R. and H.R. were placed in foster care, instead of with Father, because "[h]e was not able to come to Indianapolis so that we could get more information and determine his stability and safety." *Id.* at 26. She further explained, "With the history that I was aware of for Indianapolis there were concerns for substance use and domestic violence in the past, but I wasn't able to speak with [Father] and meet with him to fully access [sic] those things." *Id.* at 28.

[14] DCS next called to testify Crystal Heard ("Heard"), who was a home-based case manager and a visitation facilitator in Indiana. DCS referred the family to her in June 2017. As to Father, she observed three or four visits with A.R. and

H.R. while he was in Indianapolis. She said that "[t]he girls are very excited to see their father" and on the way to the visits say that "they can't wait to see him." *Id*. at 32-33. The girls stated to Heard that they "can't wait for this to be over" "because they want to go back with their dad[.]" *Id*. at 33. Heard described that, in her observations, Father seemed like "a concerned father," he appropriately addressed behaviors, and had healthy conversations with them. *Id*. at 36. When asked if Father ever said anything or acted in a way to give her worry about his judgment or ability to parent, Heard said "No." *Id*. She likewise said that she had no safety concerns regarding his ability to "tak[e] care of the kids." *Id*. Heard acknowledged that Father drove nine hours each time to get to Indianapolis for court hearings and visitations. Heard testified that, in her opinion, placing A.R. and H.R. with Father was in their best interests. *Id*. at 38.

[15] Heard did notice that Father was nervous and shaky during one or more visitations, which she indicated gave her some concern. *Id*. at 33-34. Upon DCS questioning, Heard acknowledged that she had never been to Father's North Carolina home and could not testify if it was appropriate, and she was not fully aware of the services in which Father was participating in North Carolina, but recalled that he was in a father's program and that drug screens were included in a North Carolina order.

[16] Korinne Fox-Sibanda ("Fox-Sibanda"), a home-based therapist and visitation supervisor in Indiana, testified that her only contact was with Mother and A.R. Fox-Sibanda testified that, even if A.R. and H.R. were placed with Father, that

she would recommend that A.R. have continued therapy due to traumas. Father's counsel, on cross-examination, asked Fox-Sibanda, "Are you aware that [NCDSS] arranged individual therapy for [A.R.] down there?" and she replied that she was not aware but said it would be beneficial, adding that family therapy with Father also would be beneficial. *Id*. at 43-44.

[17] Next to testify at the October 11 hearing was FCM Michelle Johnson ("FCM Johnson"), who began involvement with the family in June 2017. She said that she learned from Father that "they do have an open case in North Carolina" and that his relationship with Mother is "not good" and that he had filed for dissolution. *Id*. at 48; 53. When asked if she knew what services Father was participating in, FCM Johnson said, "I believe he mentioned something about a Father Engagement program and I believe something related to substance abuse." *Id*. DCS counsel inquired further about drug use, either on his own or with Mother, and FCM Johnson said, "During some of the telephone conversations and in-person contact that I had with [Father] . . . he indicated that they did do drugs here in Indiana with [Mother] and their friends, but he didn't identify what substance they were using." *Id*. at 51. FCM Johnson testified that referrals had been made as to Mother for home-based therapy, home-based case management, supervised visits, therapeutic visits, a substance abuse evaluation, and random screens, but, as to Father, only random screens when he was in town had been recommended. FCM Johnson did not recall seeing or receiving any documents concerning custody of A.R. and H.R. *Id*. at 53.

[18]     FMC Johnson recalled that she had spoken to the case manager in North Carolina four to six times, and she was informed about services in which Father had been participating. FCM Johnson learned that, initially, Father had visitations supervised by his mother, "but ended up with the children in his care and his mother is no longer a party as to supervising the visits." *Id*. at 55-56. As to services, she was told that he was in a father's program and had random drug screens, noting that "recently I believe that they indicated they were trying to get him to do a screen but he didn't screen when they asked him to, but other than that he's engaged in the services." *Id*. at 60. Father told FCM Johnson that "he was screening until his job took him out of county or something of that nature and it was kind of difficult for him to screen." *Id*. at 64. FCM Johnson stated that, if Father were ordered to participate in screens, that she would "want to see that those screens are happening." *Id*. at 63. FCM Johnson's last conversation with the FCM in North Carolina was that Father was "actively participating" in "[a]ll the services." *Id*. at 66. Father told FCM Johnson that he is willing to participate in any substance abuse treatment. *Id*. at 64.

[19]     The information that FCM Johnson learned from the North Carolina FCM about Father's "housing environment" is that it was "appropriate" and that Father was "working and he can meet the needs of the children." *Id*. at 56. During FCM Johnson's testimony, certified copies of court documents from North Carolina were admitted without objection. *Id*. at 54 (admitting *Pet'r's Exs*. 1-4). Counsel for Father asked FCM Johnson, "Do you have any safety concerns today if [A.R. and H.R.] are placed with father in North Carolina?"

and she responded, "No. Not based off the information from North Carolina, no." *Id*. at 56. However, FCM Johnson stated that seeing Father be arrested at the start of the day's hearing did give her some concern about the children's safety, explaining "If he's going to be an absent parent . . . obviously it's going to be a safety concern." *Id*. at 62.

[20] There was testimony outlining the multiple placements that A.R. has been in throughout the proceedings,[5] and counsel asked, "[Y]ou have no safety concerns placing her with [F]ather?" and she replied, "No." *Id*. at 58; *see also id*. at 60 (stating that she had no safety concerns for A.R. and H.R. in Father's care as long as Mother was not living with Father). She acknowledged that if A.R. were returned to North Carolina, that she would return to a prior school that she attended and that it would be a familiar environment for her. *Id*. FCM Johnson had briefly observed parenting time between Father and A.R. and H.R., and her impression was "[t]hat the girls love their father and they wanted to be with him[,]" noting that in her monthly one-on-one visits with the girls "that's usually the conversation when I see them[,] you know that's what they know, that's where they want to be and they just say it all the time that they want to be with their father." *Id*. at 61-62.

---

[5] Throughout the course of the CHINS proceedings, A.R. was moved at least five times, from foster care, to emergency shelter placement at YOC due to reports of sexual contact that occurred in the foster home, to another placement through the Courage Center/Children's Bureau, to another placement through Seeds of Life, to another foster care placement in Martinsville, Indiana.

[21]     Because Father had been arrested at the start of the October 11 hearing, the juvenile court offered to Father's counsel to schedule an additional hearing so that Father could testify, and the hearing was reconvened on November 30, 2017. On November 15, 2017, DCS filed a Request for Judges to Communicate pursuant to the Uniform Child Custody and Jurisdiction Act ("UCCJA"), stating that temporary emergency jurisdiction is provided pursuant to Section 204 of the UCCJA and that under that same section the judges "must" communicate. *Appellant's App. Vol. II* at 131-34.

[22]     At the start of the November 30, 2017 fact-finding hearing, the juvenile court stated that it had contacted the North Carolina judge to schedule a conference under UCCJA, but that no conference had yet been scheduled.[6] Father's counsel called Father to testify. Father stated that this was his seventh time coming to Indiana on the matter, stating that his purpose was "trying to get my two children back." *Id*. at 85, 88. Father drove to Indiana on each occasion. Father testified that he was still married to Mother, but had filed for dissolution on three occasions and hoped to "be completely done with the situation." *Id*. at 87. Father was currently living in North Carolina with Byars, his three children, and one of hers. Father said that North Carolina filed the Motion to Re-Open the closed CHINS case because, initially, he had supervised visitation but when the three children came back to live with him, North Carolina needed

---

[6] The juvenile court asked counsel for DCS and for Father whether each desired to be present for the judges' telephonic conference, and both of them waived their presence, as did the guardian ad litem. *Tr. Vol. II* at 78, 81.

to "go back and remove the sanctions." *Id.* at 89. He said that NCDSS had been to his three-bedroom residence. Father stated that, as part of court-ordered services, Father attended drug treatment class twice a week, but that he had just recently started it. *Id.* at 89-90. He had also completed a Strong Fathers class in September 2017, which he described as a domestic violence class that taught skills with how to deal with children on different age levels. Father testified that he and Byars were both employed, and they were current on rent. Father stated that a family therapist "comes out . . . two to three times a week." *Id.* at 92. Father said that A.R. and H.R. love him and also Byars, and "I think that they need to be back with their family, with their siblings that I have in North Carolina, and I just think that it would be a better life in North Carolina where their other brother and sisters are and with me and [Byars] instead of being here where they really have nobody." *Id.* at 95.

[23] On cross-examination, Father was asked why his parenting time was supervised and why the CHINS case was re-opened. He explained that it was supervised because "I . . .was not finishing my classes and not going to class like I was supposed to." *Id.* at 99. The case was re-opened as to the three children living with him, so that visits were no longer required to be supervised.

[24] DCS called the current foster parent ("Foster Parent") of A.R. She testified that A.R. had lived with her for about a month, that A.R. received home-based and other therapy, and that she was currently suspended from school due to behavior issues, but would be going back in a couple of days. Foster Mother said "Her behavior has been okay. She's just a little home sick." *Id.* at 102. By

home sick, Foster Mother explained, "She talks all day about being with dad, being with dad, dad. So she – I feel like that she has a lot of confidence in her dad and she really loves her dad." *Id.* at 104.

[25] Counsel for DCS presented closing argument that the open CHINS case in North Carolina only covered the three children that were with Father, that A.R. has issues and needs therapy, and that DCS is concerned "that she continue to receive assistance and services. . . . We want to be sure that . . . the children will be safe in his care." *Id.* at 105. The GAL stated to the juvenile court that the girls have said from the beginning that they want to be with Father and no one else, that A.R. would be much better back with her siblings, that "this has been open for way to[o] long[,]" and "I think that they both need to go back to [F]ather in North Carolina if at all possible as soon as possible." *Id.* at 105. The juvenile court took the matter under advisement.[7]

[26] On February 5, 2018, the juvenile court issued an order adjudicating A.R. and H.R. to be CHINS ("the CHINS Order"). The CHINS order found, in part:

> 20. [Father's] supervised parenting time sessions with [A.R. and H.R.] has been positive.
>
> 21. [Father] is currently engaged in drug treatment in North Carolina. This program meets twice a week. [Father] began this

---

[7] On January 29, 2018, Father filed a motion requesting placement with him, asserting that ICPC does not apply to his situation because he is the biological father. *Appellant's App. Vol. II* at 148.

service just prior to the [Indiana] November 30, 2017 [fact-finding] hearing.

22.  [Father] is engaged in a Strong Father's program in North Carolina.

24. . . .The children's current custodial parent is [Mother]. . . . Pursuant to the last known order dated July 15, 2016, [Father's] parenting time with [A.R. and H.R.] is ordered to be strictly supervised.  The original concern of the [NCDSS] regarding [Father's] drug use has not been fully addressed as [he] only recently started substance abuse treatment.

25.  [A.R. and H.R.] need care, treatment, or rehabilitation that the children are not receiving; and are unlikely to be provided or accepted without the coercive intervention of the Court.  Despite being recommended to engage in substance abuse treatment in June of 2017 and presumably being ordered to engage in this treatment prior to the closure of the children's matter in July of 2016, [Father] did not begin the substance abuse treatment until just prior to the November 30, 2017 hearing.  [Father] indicated that he completed the Strong Father's program, on September 23, 2017.  However, the Court does not find this testimony to be reliable as the findings of the September 19, 2017 order [North Carolina juvenile court] indicate that [Father] had completed only four of the 20-week program as of August 2, 2017.  Therefore, [Father] would not have been slated to complete the program until the end of December.  As [Father] did not engage in domestic violence and substance abuse treatment in a timely manner under the previous child welfare matter, the Court finds that this Court's intervention is necessary to ensure that [Father] engages in and completes any other additional services.

*Id.* at 154-55.  The juvenile court continued,

[Father] has been involved in past child welfare matters since 2015 and only recently began services to address substance abuse and domestic violence.

Should [Father] return to North Carolina with the children, [Mother] has the means and the legal right to travel to North Carolina to retrieve them. Should this occur, the children are likely to return to the exact situation that they were in when this cause of action was filed[.]

[A.R. and H.R.] need a parent who is stable, sober and able to provide a healthy environment. Neither [Mother] nor [Father] is this individual at this time.

[T]he Court finds that the children are in need of services pursuant to Indiana Code [§] 31-34-1-1 as it pertains to [Father].

*Id.* at 155.

[27] On February 22, 2018, the juvenile court held a dispositional hearing. Father, by counsel, asked the juvenile court to reconsider the CHINS adjudication as it pertains to Father, advised the court that Father had petitioned for custody of the five children in North Carolina, and requested increased parenting time and temporary trial visitation. The next day, the juvenile court issued a dispositional order, which, among other things, continued the temporary placement of A.R. and H.R. in foster care. *Id.* at 35. Father now appeals.

# Discussion and Decision

## I. Jurisdiction under UCCJA

[28] Father argues on appeal that the Indiana juvenile court did not have jurisdiction to enter a CHINS adjudication or disposition. In determining whether a trial court has improperly exercised jurisdiction under UCCJA, we apply an abuse of discretion standard. *In re Paternity of R.A.F.*, 766 N.E.2d 718, 723 (Ind. Ct. App. 2002), *trans. denied.* An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or if the court has misinterpreted the law. *Id.*

[29] The UCCJA, Indiana Code section 31-21-5-1(a)(1) *et. seq.*, is a procedural framework to avoid having courts from different states issuing contradictory child custody orders. The UCCJA is the exclusive method of determining the subject matter jurisdiction of a court in a custody dispute with an interstate dimension. *R.A.F.*, 766 N.E.2d at 723. "Under the UCCJA, the court which first enters a custody decree on a matter gains exclusive jurisdiction only until the child and all parties have left the state." *Id.* Under that proposition, North Carolina had exclusive jurisdiction in this case because it awarded custody to Mother and retained jurisdiction until the children and all parties left the state, and, here, Father and three children still resided in North Carolina. *See Pet'r's Exs*. 1, 2 (July Review Order stating that North Carolina "retains jurisdiction in this matter until terminated by order of the Court" or until the children reach age of majority). *Id.* Although a CHINS case is not a custody dispute per se, we have held that when considering a CHINS case, a juvenile court must

exercise its jurisdiction within the framework and policy considerations of the UCCJA. *R.A.F.*, 766 N.E.2d at 724-25 (citing and discussing *In the Matter of E.H.*, 612 N.E.2d 174 (Ind. Ct. App. 1993), *opinion adopted*, 624 N.E.2d 471 (Ind. 1993)).

[30] In *E.H.*, this court "considered the application of the UCCJA to an Indiana court's exercise of jurisdiction pursuant to our CHINS statute." *R.A.F.*, 766 N.E.2d at 724-25. In *E.H.*, the mother and father lived in Texas and were the parents of two children. Their marriage was dissolved in Texas, with primary physical custody awarded to the mother, and she moved with the two children to Indiana. *E.H.*, 612 N.E.2d at 176-77. Following a visitation with father in Indiana, the mother suspected that he had sexually abused them. *Id*. at 177. A CHINS petition was filed in Indiana, and the juvenile court found that the children were CHINS and entered orders for evaluation and therapy, and eventually terminated Father's parental rights. *Id*. at 180-81. Father appealed, arguing that the Indiana CHINS court lacked jurisdiction, and a divided court of appeals determined that the Indiana CHINS court had jurisdiction to act, although ultimately reversed the CHINS determination and dispositional order and the termination of father's parental rights because of lack of evidentiary support. *Id*. at 189-90 (Barteau, J., concurring in result; Chezem, J., dissenting).

[31] On transfer, our Supreme Court adopted this court's majority opinion in *E.H.*, which recognized that "when confronted with existence of a valid foreign custody-visitation determination, the CHINS court must proceed under the

provisions of the UCCJA" and that, pursuant to a then-existing emergency provision in the UCCJA,[8] the Indiana CHINS court was allowed to exercise temporary jurisdiction "for the duration of the emergency[,]" but should terminate its jurisdiction after the emergency has passed. *Id.* at 184-86.

[32] This court similarly considered the relationship between the CHINS and UCCJA statutes in *T.Y.T. v. Allen County Division of Family and Children*, 714 N.E.2d 752 (Ind. Ct. App. 1999), where the mother appealed a CHINS determination. In *T.Y.T.*, the child was born in California to the mother, who was soon arrested for underage drinking. The child was removed from her care and placed with a man identified by mother as being the father. *Id.* at 754. When the child was around one year old, the father took the child to Indiana, left child with a child care provider, and did not return. At that time, the mother was living in Illinois with a boyfriend. A CHINS petition was filed, mother did not appear for hearings, and the child was determined to be a CHINS and placed in foster care. *Id.* The mother appealed, arguing among other things that the Indiana CHINS court did not have jurisdiction. *Id.* at 754-55. The *T.Y.T.* court recognized the following:

> A juvenile court has original jurisdiction over CHINS proceedings, pursuant to Ind. Code Ann. § 31-30-1-1[]. The jurisdiction conferred on courts in such cases enables the State to

[8] The provision allowed a state to make a custody determination when the child is physically present in the state, and "it is necessary in an emergency to protect the child because he has been subjected or threatened with mistreatment or abuse or is otherwise neglected or dependent." *In re Paternity of R.A.F.*, 766 N.E.2d 718, 725 (Ind. Ct. App. 2002) (citing Ind. Code § 31-1-11.6-3(a)(3)(B)), *trans. denied*.

respond to emergency situations involving children who are not likely to be helped without court intervention. *Matter of E.H.*, 612 N.E.2d at 174. In such cases, jurisdiction under the CHINS statutes is temporary, lasting only for the duration of the emergency. When the emergency passes, the temporary jurisdiction conferred by the CHINS statutes ends. *Id.*

*Id.* at 755. The *T.Y.T.* court rejected the mother's claim that the CHINS court did not have jurisdiction to preside over a CHINS proceeding, stating "the court has jurisdiction to address an emergency, which certainly includes where the child should stay until the matter is resolved." *Id.*

[33] Currently, the UCCJA allows for a court to exercise emergency jurisdiction pursuant to Indiana Code section 31-31-5-4, which provides:

> (a) An Indiana court has temporary emergency jurisdiction if the child is present in Indiana and:
>
> > (1) the child has been abandoned; or
> >
> > (2) it is necessary in an emergency to protect the child because:
> >
> > > (A) the child;
> > >
> > > (B) the child's sibling; or
> > >
> > > (C) the child's parent;
> >
> > is subjected to or threatened with mistreatment or abuse.

Ind. Code § 31-21-5-4(a). If an Indiana court that is exercising jurisdiction under that section is informed that a child custody proceeding has been commenced in or a determination has been made by a court of another state, the Indiana court shall immediately communicate with the court of the other state to resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order. Ind. Code § 31-21-5-4(g).

[34] Here, the Indiana juvenile court was faced with a situation where Mother took A.R. and H.R. from North Carolina and brought them to Indiana. DCS removed them from her home, and the Indiana CHINS petition was filed to protect A.R. and H.R. because Mother demonstrated an inability to care for them. The verified CHINS petition and the preliminary inquiry revealed that Mother appeared to be using drugs, had exposed the Children to violence, was avoiding DCS, hiding H.R., and claiming she would be leaving for North Carolina soon. Father and Mother had domestic violence issues from when they lived together. At the time of removal, the most recent North Carolina order allowed only supervised visitation for Father, and A.R. and H.R. were placed in foster care. During the CHINS proceedings, Indiana DCS caseworkers were in contact with the North Carolina caseworkers with regard to the situation with Mother in Indiana and with regard to Father's status, home, and the re-opened CHINS case. At one point, the Indiana juvenile court made contact with the North Carolina court, but, according to the record before us, a conference between the two judges was never arranged or took place.

When NCDSS learned of the situation in Indiana, it re-opened the 2014 North Carolina CHINS-type proceeding on the three children living with Father. However, it did not re-open the prior CHINS case as to A.R. and H.R., and, therefore, we note, there were not two courts in two states issuing competing orders regarding placement of these two children.

[35] We find that under the facts of this case, and pursuant to UCCJA and case law precedent, the juvenile court was not without jurisdiction to permit the filing of the CHINS petition and conduct CHINS proceedings.

## II. CHINS Adjudication

[36] We next address Father's contention that the juvenile court's CHINS determination was not supported by the evidence. "[CHINS] cases aim to help families in crisis—to protect children, not punish parents." *In re S.D.*, 2 N.E.3d 1283, 1285 (Ind. 2014). The focus is on the best interests of the child and whether the child needs help that the parent will not be willing or able to provide. *Id.* As our Supreme Court has recognized, a CHINS adjudication may have long-lasting collateral consequences for the family, and thus, "[t]he intrusion of a CHINS judgment, then, must be reserved for families who cannot meet those needs without coercion." *Id.*

[37] When determining whether there is sufficient evidence to support a CHINS determination, we neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* at 1287. We consider only the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.*

Where, as here, a juvenile court's order contains specific findings of fact and conclusions thereon, we engage in a two-tiered review. *In re A.G.*, 6 N.E.3d 952, 957 (Ind. Ct. App. 2014). First, we determine whether the evidence supports the findings, and then, we determine whether the findings support the judgment. *Id.* We reverse a CHINS determination only if it was clearly erroneous. *In re D.J.*, 68 N.E.3d 574, 578 (Ind. 2017). A decision is clearly erroneous if the record facts do not support the findings or if it applies the wrong legal standard to properly found facts. *Id.*

[38]  A CHINS proceeding is civil in nature, so the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2017). Indiana Code section 31-34-1-1 provides that a child is a CHINS if, before the child becomes eighteen years of age:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with the necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Thus, this statute requires "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and . . . that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287. The third element guards against unwarranted State interference in family life, reserving that intrusion for families where parents lack the *ability* to provide for their children, not merely where they encounter *difficulty* in meeting a child's needs. *In re D.J.*, 68 N.E.2d at 580 (quotations omitted, emphasis in original). When determining CHINS status under section 31-34-1-1, particularly the "coercive intervention" element, courts should consider the family's condition not just when the case was filed, but also when it is heard. *Id*. "Doing so avoids punishing parents for past mistakes when they have already corrected them." *Id*. at 581.

[39] In the present case, Father contends that the juvenile court's order adjudicating A.R. and H.R. as CHINS was clearly erroneous and was not supported by sufficient evidence. In particular, Father challenges the following determinations:

> [Father] has been involved in past child welfare matters since 2015 and only recently began services to address substance abuse and domestic violence issues. The court also stated that A.R. and H.R. need a parent who is stable, sober and able to provide a healthy environment. Neither [Mother] or [Father] is this individual at this time.

*Appellant's Br*. at 14; *Appellant's App. Vol. II* at 155. Father maintains, "There is no support for the finding that [Father] cannot provide a healthy environment

and this finding is contradicted by the DCS's own witnesses who supported placing the children with their father." *Appellant's Br.* at 14. Father argues both that coercive intervention was not necessary and that the disposition did not place A.R. and H.R. in the least restrictive setting, which would have been with him. *Id.* at 13. We agree.

[40] In this case, there appears to be no dispute that Father loves A.R. and H.R. and that, from the start of the CHINS proceedings, Father has requested placement of them with him, and that he drove from North Carolina to Indiana on at least seven occasions for hearings. There is also no dispute that A.R. and H.R. love Father and have expressed to case workers, visitation supervisors, the GAL, and foster parents that they wish to be placed with Father. The inquiry is whether DCS presented sufficient evidence to establish that A.R. and H.R. were CHINS and whether disposition that directed continued foster care was warranted. Our Supreme Court has recently recognized that "'[n]ot every endangered child is a child in need of services,' and not every endangered child needs 'the State's *parens patriae* intrusion into the ordinarily private sphere of the family.'" *In re D.J.*, 68 N.E.3d at 580 (quoting *In re S.D.*, 2 N.E.3d at 1287).

[41] Here, when Mother and Father were living together in North Carolina, a CHINS-like petition was filed by NCDSS in September 2014, alleging abuse or neglect, substance abuse by parents, and domestic violence, and the children were in the care and control of NCDSS for some period in 2014 through sometime in 2016. Evidence was presented at a review hearing that, by May 2016, Father was employed, paid child support, visited regularly, was bonded

with the children, but had failed some drug screens. The ensuing July 2016 Review Order awarded custody to Mother, directed that Father's visitation be supervised, and closed the CHINS matter.

[42] At or around the end of the school year in 2016, Mother left North Carolina with all five children, but returned with them to North Carolina not long after, and three of the five children went to live with Father. In or around April 2017, Mother returned to Indiana with A.R. and H.R. Because NCDSS received reports in May 2017 that, among other things, the children were not attending school, the NCDSS filed a petition in June 2017 to re-open the CHINS matter. NCDSS conducted an investigation of Father's residence and found no evidence of abuse or neglect, and social worker Phillips reported that Father had taken and passed all screens and had started attending a substance abuse group. NCDSS asked the North Carolina court to allow the three children to live with Father and to lift the order of supervised visitation.

[43] Meanwhile, in Indiana, DCS received reports about Mother's lack of care, and, eventually, DCS removed A.R. and H.R. from her home in June 2017 and filed the CHINS petition. The intake report filed with the juvenile court indicated that DCS had been in contact with North Carolina's social worker Phillips, who had "no immediate concerns" with Father and reported that Father was "actively participating" in services. *Appellant's App. Vol. II* at 51. The juvenile court placed A.R. and H.R. in foster care and appointed a CASA and GAL. At the pretrial hearing, DCS reported that, according to NCDSS, Father and his girlfriend, Byars, are appropriate with the children, that Father was

participating in services, and that the North Carolina CHINS matter "will be closing soon." *Id*. at 88. The GAL in Indiana opined that A.R. and H.R. be placed on TTV with Father "as soon as possible." *Id*. at 92. DCS objected to TTV due to the still-open CHINS proceeding in North Carolina.

[44] At the July 27, 2017 hearing, Father's counsel asked that A.R. and H.R be placed with Father, but counsel for DCS objected, stating that at a mediation that took place the week prior, Father had tested positive for oxycodone. Father's counsel was unaware of that screening, and no evidence of it was admitted into evidence. Father took and passed a drug screen on July 27, 2017. However, the juvenile court indicated that it was "still worried a little bit about [F]ather" and continued the children in foster placement. *Tr. Vol. II* at 11.

[45] After that July hearing, and before the next Indiana fact-finding hearing, the North Carolina juvenile court issued the September 2017 Review Order stating that Father had attended four of twenty Strong Fathers classes, with Father explaining that he had missed some classes due to being in Indiana for hearings. In the September 2017 Review Order, the North Carolina juvenile court directed Father to attend the remaining weeks without further absences. It also reflected that Father had completed a clinical assessment and was recommended to participate in a substance abuse group and Narcotics Anonymous. The assigned social worker said that she would be working with Father and Byars to arrange therapeutic services for the three children. The North Carolina GAL said that the three children living with Father were doing well, felt safe, and wanted all five siblings to be back together. The September

2017 Review Order directed that the three children living with Father continue to do so, lifted the requirement that Father's visitation with the three children be supervised, and ordered that a copy of the order be sent to the Indiana juvenile court.

[46] When Father appeared at the October 11, 2017 CHINS fact-finding hearing in Indiana, he was taken into custody on open warrants, although there was no information on the record discussing the subject matter or basis of the warrants. At the hearing, DCS assessment worker Turley testified that after A.R. and H.R. were removed from Mother's home, she spoke with Father to advise him about the situation with Mother. Turley explained that A.R. and H.R. were initially placed in foster care because "[w]ith the history that I was aware of for Indianapolis there were concerns for substance abuse and domestic violence in the past[,]" and Father was not able to immediately come to Indianapolis "so that we could get more information and determine his stability and safety." *Tr. Vol. II* at 26, 28. The home-based case manager and visitation facilitator, Heard, said that A.R. and H.R. were consistently excited to see their Father, and that, in Heard's observations of Father, he seemed like "a concerned Father" who appropriately addressed behaviors and had healthy conversations with A.R. and H.R. *Id*. at 36. She further stated that Father did not act in a way to give her worry about his judgment or ability to parent and that she had no safety concerns regarding his ability to take care of them. *Id*.

[47] FCM Johnson stated that during some in-person contact with Father, he shared with her that he and Mother in the past did drugs in Indiana with their friends,

but nothing more specific. FCM Johnson had spoken with the North Carolina FCM four to six times during the course of the proceedings and, according to their most recent conversation, she learned that Father was "actively participating" in "[a]ll the services." *Id.* at 66. The North Carolina FCM also told FCM Johnson that Father's housing environment was appropriate and that Father was employed and can "meet the needs of [A.R. and H.R]." *Id*. at 56. Father told FCM Johnson that he is willing to participate in any substance abuse treatment. When FCM Johnson was asked if she had any safety concerns about placing A.R. and H.R. with Father, she replied that, based upon the information she had received from North Carolina, she did not have any safety concerns, so long as Mother was not living with Father. *Id*. at 56, 58, 60. However, FCM Johnson did have concern about Father being arrested at the start of the hearing, saying, "If he's going to be an absent parent . . . obviously it's going to be a safety concern." *Id*. at 62. FCM Johnson stated that if A.R. and H.R. were returned to North Carolina, A.R. would return to a prior school that she had attended and to a familiar environment.

[48]    At the November 30, 2017 fact-finding hearing, Father testified that NCDSS had been to his residence and approved of it, that as part of court-ordered services he was attending a drug treatment class twice a week, although he had just recently started attending. *Id*. at 89-90. Father testified that he had completed a Strong Father's program in September 2017, although the Indiana CHINS court found that this assertion was not "reliable" because, according to North Carolina's September 2017 Review Order, Father had completed four of

the 20-week program as of August 2, 2017, and therefore, Father would not have been slated to complete the program until the end of December that year. *Appellant's App. Vol. II* at 155. Father testified that he and Byars were both employed, current on rent, and that a family therapist comes to the home two to three times per week.

[49] The current foster mother for A.R. testified that A.R. had been experiencing behavior issues and was currently suspended from school, but would be returning in a matter of days. The foster mother indicated that A.R. was "home sick" and "talks all day about being with dad[.]" *Tr. Vol. II* at 102, 104. The GAL shared, in closing remarks, her opinion that "this has been open for way to[o] long" and that A.R. and H.R. "need to go back" to Father's residence "as soon as possible." *Id.* at 105.

[50] We find that it was appropriate for DCS to file the CHINS petition and for the juvenile court to hold CHINS proceedings for some period of time to find temporary placement for A.R. and H.R. while gaining information about the North Carolina proceedings and that state's assessment of Father and his home. However, we cannot say that the State proved by a preponderance of the evidence that A.R. and H.R. needed care or treatment that was unlikely to be provided or accepted without the juvenile court's coercive intervention. Although Father has some history of making poor choices involving substance abuse and domestic violence with Mother, the record reflects that he "has made every effort to remedy the situation and become a suitable caregiver[,]" and at the time of the fact-finding hearings, Father was actively participating in all

services, his home was approved by NCDSS, and there were no specified concerns for his ability to care for the children. *Matter of B.L.P.*, 91 N.E.3d 625, 635 (Ind. Ct. App. 2018) (reversing termination of a father's parental rights). Accordingly, we reverse the juvenile court's CHINS determination.

Reversed.

Vaidik, C.J., and Riley, J., concur.