# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 05 2020, 8:25 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT K.C.

Sybil T. Sharvelle
Truitt Ray Law
Lafayette, Indiana

ATTORNEY FOR APPELLANT R.C.

Benjamin J. Church
Church Law Office
Monticello, Indiana

ATTORNEYS FOR APPELLEE

Robert J. Henke
Monika Prekopa Talbot
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of A.C. and P.C., Children in Need of Services, <br><br> K.C. and R.C. (Parents), <br><br> *Appellants-Respondents,* <br><br> v. <br><br> Indiana Department of Child Services, <br><br> *Appellee-Petitioner.* | June 5, 2020 <br><br> Court of Appeals Case No. 19A-JC-2706 <br><br> Appeal from the White Circuit Court <br><br> The Honorable Jason A. Thompson, Judge <br><br> Trial Court Cause Nos. 91C01-1907-JC-20 91C01-1907-JC-21 |

**Kirsch, Judge.**

K.C. ("Mother") and R.C. ("Father") appeal the trial court's determination that A.C and P.C. were children in need of services ("CHINS"). Mother and Father ("Parents") raise two issues, but we address only one, which we restate as whether the juvenile court committed clear error in ruling that A.C. and P.C were CHINS.[1]

We affirm.

## Facts and Procedural History

Mother and Father married in 2013. *Tr. Vol. II* at 119. They live with their children, A.C., born in February of 2008, and P.C., born in May of 2017. *Appellants' App. Vol. II* at 21-23. Mother is the biological parent of both A.C. and P.C. (collectively, "Children"), and Father is the biological parent of P.C., and A.C. is his stepson. *Tr. Vol. II* at 117, 158.

Beginning in August 2017, DCS received multiple reports that there was physical abuse, domestic violence, and drug use in the home. *Id.* at 8. On

---

[1] In Parents' other issue, they contend the evidence does not support Finding #10, in which the juvenile court found: "Mother and Father both have a defensive attitude, blaming others, *and [are] not taking responsibility or action to correct the problems.*" *Appellants' App. Vol. II* at 67 (emphasis added). Parents claim their efforts to remedy their problems show that Finding #10 is clearly erroneous, and the Department of Child Services agrees. Because this point is not disputed and also bears no impact on our resolution of this appeal, we focus only on the question of whether the CHINS determination, in light of the other findings and evidence, was clearly erroneous.

September 27, 2018, DCS received a report that there was methamphetamine use in the household. *Id.* In October 2018, DCS received a report that Parents used drugs and that Father was "belligerent at the school." *Id.* On March 8, 2019, DCS received a report that Parents had used methamphetamine and were involved in domestic violence. *Id.* On March 8, 2019, Family Case Manager ("FCM") Blake Denton ("FCM Denton") assessed the family and spoke with Father. *Id.* at 35.

[5] On June 8, 2019, FCM Melissa Barrett ("FCM Barrett") received a report about domestic violence and substance abuse at Parents' home. *Id.* at 8. The report alleged that Mother had left the residence with Children. *Id.* FCM Barrett called Mother, and the two arranged to meet the following day, on June 9, 2020. *Id.* at 11. At the meeting, Mother told FCM Barrett that she and Father had fought, so she and Children left home while Father was in the shower. *Id.* at 12. Mother also said that, three weeks earlier, she and Father had argued and Father grabbed her by the neck, shoved her against the wall, and choked her. *Id.* Mother said that she fought back and scratched Father's face. *Id.* Mother said that Father's "temper would get bad enough to where it would lead to physical violence." *Id.* at 12-13.

[6] FCM Barrett noticed that Mother's physical appearance was consistent with drug use. *Id.* at 15. Mother had round, healed sores all over her arms, chest, and face. *Id.* She also had an open sore on her left chin. *Id.* Based on her training and experience, FCM Barrett concluded that these sores might indicate

methamphetamine use by Mother. *Id.* Mother's unkempt appearance also aroused FCM Barrett's suspicions that Mother was using drugs, so FCM Barrett asked Mother if she was using illegal drugs. *Id.* Mother denied using drugs but refused to take a drug screen to corroborate her denial. *Id.*

[7] Later that same day, Mother texted FCM Barrett that Father had locked himself inside the house with P.C. *Id.* at 16. FCM Barrett called 911 and met Parents and the police at the home. *Id.* at 17. Father appeared agitated. *Id.* Mother said that when she had earlier arrived at the home, she and Father argued, and Father called her names. *Id.* The police arrested Father because he had open warrants on unrelated matters. *Id.* at 17-18, 22-23. The domestic violence incidents raised FCM Barrett's concern for the safety of Children. *Id.* at 18.

[8] On June 10, 2019, FCM Denton was assigned to the case. *Id.* at 32-33. FCM Denton learned that there was a no-contact order protecting Mother, Children, and Maternal Great-Grandfather from Father. *Id.* at 17, 39. FCM Denton then contacted Mother and asked her to take a drug screen, but Mother refused. *Id.* at 33. FCM Denton and Mother exchanged text messages in June and arranged a meeting for late June, but Mother cancelled the meeting at the last minute, allegedly because of her work schedule. *Id.* at 34-35, 37. FCM Denton was finally able to meet with Mother on July 5, 2019, and he learned that Father was back in the home. *Tr. Vol. II* at 37.

[9] On July 8, 2019, the Indiana Department of Child Services ("DCS") filed a verified petition alleging Children to be CHINS. *Appellants' App. Vol. II* at 21-23. The primary allegations in the petition pertained to drug use and domestic violence. *Id*. The same day, DCS filed a verified petition to remove Father from the residence. *Id.* at 25-26. After holding an initial hearing on July 9, 2019, the juvenile court ordered Father to be removed from the home. *Id*. at 40.

[10] The next day, FCM Janie Erzinger ("FCM Erzinger") met the family. *Tr. Vol. II* at 52. By that time, the protective order was back in place through the CHINS case, and Father had been removed from the home.[2] *Id*. FCM Erzinger offered to facilitate supervised visits between Father and Children. *Id*. During the first visitation, on July 9, 2018, Father cried and made inappropriate and sarcastic comments to A.C. about DCS. *Id*. at 53. Among other things, Father said: "DCS doesn't need to be involved. This case is nothing but lies." *Id*. at 54. FCM Erzinger spent forty-five minutes of the one-hour visit with Father, away from Children, trying to calm him down. *Id*. at 53. FCM Erzinger then visited Mother, who admitted to having used illegal drugs, and then they, with help from Maternal Great-Grandfather, created a safety plan that if Mother used illegal drugs again, she would tell Maternal Great-

---

[2] The protective order has since been lifted. *Tr. Vol. II* at 122.

Grandfather, who would then take care of Children. *Id.* at 55-56. Around this time, child P.C. tested positive for methamphetamine. *Id.* at 55.

[11] Afterwards, FCM Erzinger often tried to contact Parents, but "there was a lot of evasiveness." *Id.* at 57. When FCM Erzinger went to the house, no one answered the door. *Id.* Father never communicated with FCM Erzinger, and Mother's communication with FCM Erzinger was sporadic. *Id.*

[12] On July 30, 2019, Parents participated in a family team meeting. *Id.* Father was agitated and belligerent, and he kept leaving the room. *Id.* at 58. Father accused DCS of "setting him up" with the drug testing because he had smoked THC in the past and believed that DCS would hold it against him if the test came up positive. *Id.* Father repeatedly claimed that the family had no problems, including domestic violence, and did not need services. *Id.* at 59. The next day, the home-based case manager told FCM Erzinger that Father said his drug test would be positive for methamphetamine "because the person he stayed with was actively using." *Id.* at 59-60.

[13] Communication with Parents continued to be sporadic. *Id.* at 61. Whenever FCM Erzinger stopped by the house, there was no answer. *Id.* at 60. Mother cancelled appointments at the last minute, and Father did not communicate with FCM Erzinger. *Id.* DCS was concerned about Father being in the home because there had been a report about Father going there to shower and do laundry. *Id.* at 61. Therefore, DCS filed a petition to remove Children from the

home due to concerns that Parents violated the no-contact order and used illegal drugs. *Id.* at 61, 63. When FCM Erzinger went to the residence to remove Children, Father was there. *Id.* at 65. DCS placed Children with Father's mother ("Paternal Grandmother"). *Id.* at 66.

[14] At the fact-finding hearing, FCM Erzinger acknowledged that Parents had participated in assessments and random drug screens. *Id.* at 81-82. However, she described both Mother's and Father's participation in drug screens as "sporadic." *Id.* at 81. The juvenile court took judicial notice of the protective order under cause number 91C01-1906-PO-85, and Father testified that the allegations that formed the basis of the petition for the no-contact order related to domestic violence. *Id.* at 128. Father testified that he and Mother were in marital counseling and that the counseling improved their communication. *Id.* at 119. Father also testified that he was participating in a character restoration program and that he found the program helpful and planned to finish it. *Id.* at 121, 135, 138-39. FCM Erzinger testified that Father has recently started working two jobs, and Mother has full-time employment. *Id.* at 89, 95, 134, 159. Father told FCM Erzinger that he needed to work two jobs because he was behind on his bills. *Id.* at 89, 95.

[15] FCM Erzinger testified that she was concerned that Parents would not comply with the services if the CHINS cases were dismissed. *Id.* at 70-71, 89. FCM Erzinger believed that Children were CHINS. *Id.* at 71. In Court Appointed Special Advocate ("CASA") Connie Cripe's opinion, Children were well-

adjusted at Paternal Grandmother's home. *Id*. at 110. CASA Cripe added that Children's safety was first, and if there were drugs and domestic violence in the home, then the home was not safe for them. *Id*. at 110-11.

[16]     In its order issued on September 5, 2019, the juvenile court stated:

> The Court now adjudicates [Children] a Child in Need of Services as defined by IC 31-34-1-1.
>
> In Support for this conclusion of law, the following findings of fact are found:
>
> 1. Domestic Violence in the presence of [Child A.C.].
>
> 2. Mother's admission of drug use and possession of drugs to FCM Erzinger during the Safety Plan meeting.
>
> 3. FCM Barrett's observation of wounds and scabs on Mother, based on her training is conducive to methamphetamine use.
>
> 4. Filing of Protection Order for Domestic Violence by Mother against Father in Cause No. 91C01-1906-PO-000085.
>
> 5. Multiple inappropriate and/or derogatory statements to child about DCS.
>
> 6. Pattern of behavior in previous assessments and interactions with DCS in March of 2016, October of 2018, and March of 2019.

7. That there is a lack of immunizations for [Child P.C.].

8. Father has a sporadic work history.

9. Mother has a sporadic work history.

10. Mother and Father both have a defensive attitude, blaming others, and not taking responsibility or action to correct the problems.

11. CASA, based on conversations and interactions with children, believe[s] it is in the best interest of the children to not be with the parents at this time.

The children, [A.C.] and [P.C.], have been removed and are currently in relative placement.

The Court finds that it is in the best interests of the children to be removed from the home environment and remaining in the home would be contrary to the welfare of the children because of the inability, refusal or neglect to provide shelter, care, and/or supervision at the present time, and the children need protection that cannot be provided in the home.

The Court finds that reasonable efforts to prevent or eliminate removal have been met.

The Court finds responsibility for the placement and care of the child is ordered or continues to be ordered to the DCS.

*Appellants' App. Vol. II* at 66-67.

On October 21, 2019, the juvenile court issued a dispositional order, continuing Children's placement outside the home. *Id*. at 97-100; 107-10. The juvenile court ordered Parents to participate in home-based case management, parenting assessment, substance abuse assessment, mental health evaluations, random drug screens, substance abuse treatment, therapy, and supervised visitations. *Id*. at 98. Mother and Father initiated separate appeals, but we later consolidated the appeals.

## Discussion and Decision

When a juvenile court makes findings in a CHINS case, our review is governed by Indiana Trial Rule 52, which states that "the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A); *In re T.S.*, 906 N.E.2d 801, 804 (Ind. 2009). As to the issues covered by findings, we apply a two-tiered analysis, considering first whether the evidence supports the findings and then whether the findings support the judgment. T.R. 52(A); *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). Findings are clearly erroneous when there are no facts or inferences drawn therefrom that support them. *In re T.S.*, 906 N.E.2d at 804. A judgment is clearly erroneous if the findings do not support the juvenile court's conclusions or the conclusions do not support the resulting judgment. *Id.* We do not reweigh the evidence or judge the credibility of witnesses but view the

evidence and its reasonable inferences most favorably to the judgment. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012).

[19] As to issues that a juvenile court's findings do not address, we apply a general judgment standard, which requires us to affirm a judgment "if it can be sustained on any legal theory supported by the evidence." *In re S.D.*, 2 N.E.3d at 1287. Under this standard, we may look both to other findings and beyond the findings to determine if the result is against the facts and circumstances before the juvenile court. *C.B. v. B.W.*, 985 N.E.2d 340, 344 (Ind. Ct. App. 2013), *trans. denied*.

[20] A CHINS proceeding is civil in nature, so DCS must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2017). Indiana Code section 31-34-1-1 provides that a child is a CHINS if, before the child becomes eighteen years of age:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision:
>
> . . . .
>
> (2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

[21]     When determining CHINS status under section 31-34-1-1, particularly the "coercive intervention" element, courts should consider the family's situation not just when the case was filed but also when it is heard. *In re A.R.*, 110 N.E.3d 387, 401 (Ind. Ct. App. 2018). This approach avoids punishing parents for past mistakes when they have already corrected them. *Id*. "While we acknowledge a certain implication of parental fault in many CHINS adjudications, the truth of the matter is that a CHINS adjudication is simply that -- a determination that a child is in need of services." *In re N.E.*, 919 N.E.2d at 105.

[22]     Parents argue that the evidence does not support the CHINS determination because even though DCS presented evidence of domestic violence and substance abuse, this evidence did not show by a preponderance of the evidence that Children were endangered and that continued coercive intervention of the juvenile court was necessary. Parents allege that Mother had used methamphetamine only once, and they correctly observe that a single, isolated use of methamphetamine is insufficient to support a CHINS adjudication. *See In re L.P.*, 6 N.E.3d 1019, 1021 (Ind. Ct. App. 2014). Parents appear to acknowledge that the record contains evidence of other drug use but contend that evidence is too vague to support a CHINS adjudication They claim "the

State failed to prove [any other] drug use by either parent with specificity. This lack of clarity cannot sustain a CHINS adjudication as to the findings dealing with drug use." *Appellants' Br.* at 11. Thus, Parents argue that the coercive intervention of the juvenile court is not necessary to address concerns about drug use.

[23] As to domestic violence, Parents correctly observe that in Finding #1, the juvenile court found that there was only one incident of domestic violence that occurred in the presence of a child, A.C. *Appellants' App. Vol. II* at 66. Even so, Parents acknowledge that even just one occurrence of domestic violence in a child's presence is sufficient to support a CHINS determination. *See In re D.P.*, 72 N.E.3d 976, 984 (Ind. Ct. App. 2017) ("[A] single incident of domestic violence in a child's presence may support a CHINS finding, and it need not necessarily be repetitive."). Furthermore, Parents admit the record contains evidence of other instances of domestic violence. However, Parents argue that since they are addressing domestic violence and marital toil through counseling and other services, coercive intervention by the juvenile court is not necessary. *Tr. Vol. II* at 121, 135, 138-39.

[24] We disagree that DCS failed to show by a preponderance of the evidence that Children were endangered by drug use. Most notably, one child, P.C., had tested positive for methamphetamine. *Id*. at 55. Furthermore, while Parents are correct that DCS proved only one specific instance of drug use, the record shows that Mother used drugs more than once and that Father also used illegal

drugs. This evidence includes Mother's refusal to take drug tests at least twice. *Id.* at 15, 33. The evidence also includes Mother's physical appearance, that she had round, healed sores on her arms, chest, and face, and an open sore on her left chin, all tell-tale signs of methamphetamine use. *Id.* Mother admitted to FCM Erzinger that she had abused methamphetamine and prescription medications, and a safety plan had been put in place to address Mother's drug use. *Id.* at 55. Father also used methamphetamine and other drugs. *Id.* at 58-60. Thus, the most reasonable inference is that Mother and Father were more than occasional drug users and that this drug use endangered Children.

[25] We also reject Parents' argument that Children were not endangered by domestic violence. A sampling of Mother and Father's physical confrontations illustrate that Mother and Father cannot, for now, provide a safe environment for Children: 1) Mother told FCM Barrett that during one of her arguments with Father, he grabbed her neck, shoved her against the wall, and choked her. *Id.* at 12; and 2) Father's "temper would get bad enough to where it would lead to physical violence." *Id.* at 13. Even a single incident of domestic violence in a child's presence may support a CHINS determination; the violence need not be repetitive. *In re D.P.*, 72 N.E.3d at 984. Here, Parents admitted to at least one incident, and this was sufficient to support the CHINS determination. *Tr. Vol. II* at 12-13, 128, 148, 160-61. However, a reasonable inference from the foregoing evidence is that there were multiple incidents of domestic violence, including two reports of domestic violence dating back to 2017. *Id.* at 8. These

same facts regarding drug use and domestic violence also support the juvenile court's conclusion that its coercive intervention was necessary to meet the needs of Children. *Cf. A.J.L. v. D.A.L.*, 912 N.E.2d 866, 874 (Ind. Ct. App. 2009) ("The same evidence, that Aunt and Uncle had been the primary caretakers of the Children for at least the past year, also supports the trial court's finding as to Mother's voluntary relinquishment of the minor children.") (internal quotation marks omitted).

[26] We commend Parents' efforts to provide a safer environment for Children through marriage counseling, Father's participation in a character restoration program, and other services. Nonetheless, the evidence leads us to conclude that the juvenile court was not clearly erroneous in determining that its coercive intervention was necessary for the best interests of Children. CASA Cripe testified that Children's safety should be the first consideration and if there were drugs and domestic violence in the home, then the home was not safe for them. *Tr. Vol. II* at 110-11. FCM Erzinger was concerned that Parents would not comply with the services if the trial court dismissed the case. *Id.* at 70-71, 89. She testified, "I do believe that if there was no court intervention, they would not continue said services. . . . . [and] . . . they would still continue with their problems and they would probably likely escalate." *Id.* at 89. FCM Erzinger was understandably concerned because during this case, Parents were "evasive" whenever FCM Erzinger tried to communicate with Parents. *Id.* at 57. Father's sarcastic attitude toward DCS also justified her concern that he would

not continue using services if the case had been dismissed. *Id.* at 53. Even more concerning was Parents' sporadic compliance with the requirement to submit to drug testing. *Id*. at 81. These reasons convince us that the juvenile court did not commit clear error in determining that its coercive intervention was still necessary to ensure that Children were not endangered by Parents' drug use, Father's propensity toward domestic violence, and Parents' turbulent marriage.

Affirmed.

Najam, J., and Brown, J., concur.