

**ATTORNEY FOR APPELLANT**

Donald J. Frew
Fort Wayne, Indiana

**ATTORNEYS FOR APPELLEE**

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of Parent Rights of:

B.L.P. (Minor Child)

and

Br.L.P. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

January 3, 2018

Court of Appeals Case No. 02A04-1706-JT-1343

Appeal from the Allen Superior Court

The Honorable Charles F. Pratt, Judge
The Honorable Sherry A. Hartzler, Magistrate

Trial Court Cause No. 02D08-1607-JT-179

**Baker, Judge.**

[1] Br.L.P. (Father) appeals the trial court's order terminating his parent-child relationship with B.L.P. (Child), arguing that there is insufficient evidence supporting the termination order. In addition to reaffirming our prior holding that the Interstate Compact on the Placement of Children does not apply to out-of-state parents, we find that the evidence is insufficient to support termination. Therefore, we reverse and remand.

## Facts

[2] Child was born to C.V. (Mother) and Father on March 21, 2005.[1] The parents were not married, and Child lived with Mother for an unknown period of time after he was born. At some point, Child began living with his maternal grandmother (Grandmother) after both parents became incarcerated. Grandmother intervened in the paternity action and became Child's legal custodian in September 2007. In 2008, Father moved to Atlanta, Georgia, because he needed a "change of scenery" and had family members who lived in Georgia. Tr. p. 69-70. In May 2012, Father was convicted for "selling and dealing in cocaine" in Georgia, and he was incarcerated for that offense until May 2014. *Id.* at 70. As of May 2016, he was no longer on probation or parole and had completed all requirements related to his incarceration.

[3] Child has significant behavioral issues and multiple mental health diagnoses, and in October 2013, Child began acting out. Grandmother was no longer able

---

[1] Mother is not a party to this appeal.

to be Child's caregiver because of his behavioral issues as well as her own physical and mental health and financial limitations.

[4] In October 2013, the Department of Child Services (DCS) filed a petition alleging Child to be a Child in Need of Services (CHINS). The CHINS petition was based on Grandmother's inability to be a caregiver for Child as well as Mother's substance abuse and instability and Father's then-incarceration. At that time, DCS removed Child from Grandmother's care and custody and placed him in foster care.

[5] On November 13, 2013, the trial court found Child to be a CHINS. Mother and Grandmother were present at the hearing and Father participated telephonically. Mother and Grandmother admitted to the allegations in the petition. Father admitted that he was incarcerated and, as a result, unable to care or provide for Child at that time. That same day, the trial court held a dispositional hearing, ordering Father to participate in a "diagnostic evaluation within 30 days" of his release from incarceration and for him to follow the recommendations of the evaluation; the trial court also authorized supervised visitation with Child. Appellant's App. Vol. II p. 49-50.

[6] Sometime in 2014, after he was released from incarceration, Father began having regular phone contact with Child. In August 2015, Father and Child began having supervised Skype calls. Luis Hernandez, who supervised those calls, testified that Father participated in about 75% of the calls; the 25% he missed were the result of technological problems. As time went on, Father's

rate of participation improved. Hernandez believed that the interactions between Father and Child were positive and stated that Child "looks forward to speaking with his father." Tr. p. 19. Child's behavior was always appropriate during and after that contact with Father, and Hernandez had no concerns about Father and Child being in each other's presence.

[7] Indiana DCS does not have contracts in Georgia with service providers. Consequently, while the Family Case Manager recommended a provider to Father for the diagnostic evaluation, Father was required to pay for the evaluation himself. Father participated in the evaluation but he was surprised to learn he had to come back again for a second part. When he went back for the second part, "they told me I need to come back for the third part," eventually telling him that it could include "seven or eight" assessments. *Id.* at 160. Each time Father went to the provider, he had to pay $300. He could not afford to complete all portions of the assessment, and also began to believe that the service provider was purposely delaying the process so that he would have to spend more money. The provider told Father that it would not release the portion of the assessment that he had completed to DCS until Father completed the entire assessment, though the Family Case Manager testified that the provider informed her that Father "did not come in and sign off so that we can um have access to what he completed . . . ." *Id.* at 127, 160.

[8] At some point in 2016, DCS requested that an evaluation of Father's life and home be completed under the Interstate Compact on the Placement of Children (ICPC). After completing the evaluation, the evaluator did not recommend

placement of Child with Father based on two concerns: first, Father was living in a duplex and there were signs of fire damage to the apartment next door; and second, Father had recent criminal history.

[9] On July 18, 2016, DCS filed a petition to terminate the parent-child relationship between Child and his parents. The termination hearing took place on December 8 and 16, 2016. Father participated telephonically. At the time of the hearing, Father had full-time employment as a carpenter. He had maintained consistent employment since May 2013,[2] moving from a position as a laborer to a position as a carpenter; Father was on a path "to management as a safety carpenter[.]" *Id.* at 162. He had moved from the duplex to a three-bedroom home, which he shared with his girlfriend and her two sons. Father was realistic, understanding that Child would not be placed with him immediately, so he was also paying rent to a cousin who lived in the area for a bedroom for Child, in case Child was permitted to move to Georgia and be placed in relative care. *Id.*

[10] Because of financial constraints as well as his demanding work schedule, Father has been unable to travel to Indiana to see Child in person. Child's foster parents traveled to the Georgia area twice since Father was released from

---

[2] Although not entirely clear, it appears that Father was in a work release program before he was released to probation in 2014.

incarceration in 2014, and those two times are the only occasions on which Father and Child have interacted in person.

[11] Throughout the CHINS and termination cases, Father has been cooperative and communicative with DCS. He participated telephonically in conferences when asked to do so and participated telephonically at all important hearings. At the termination hearing, he acknowledged his serious criminal history and admitted that he has "made some bad decisions," but maintained that "I have made a new way for my life to live right since I've been out to work six days a week . . . . I want to show my son . . . hard work will get you where you need to get eventually . . . ." *Id.* at 161. Father insisted that "the lightbulb has finally went off. I've found a different way to provide for my family and show them structure . . . ." *Id.* at 162.

[12] On April 11, 2017, the trial court issued an order granting DCS's petition to terminate the parent-child relationship.[3] In pertinent part, it found and held as follows:

> 28.    In approximately 2008, Father moved to Georgia and
>        ceased visiting his child or maintaining regular and
>        consistent contact.

***

---

[3] The trial court terminated the parent-child relationship of both Mother and Father, but Mother has not appealed the order.

30.     During the course of the child's placement with [Grandmother], neither parent provide[d] regular and consistent financial and/or material support and care of the minor child.

*** 

37.     Since the child has been a ward of the State of Indiana, Father has only seen the child two times face to face . . . .

38.     Father has never returned to the State of Indiana since leaving in 2008. Father cites his work schedule as the impairment despite there not being any restrictions on his travel since his release and despite the travel being only eight (8) hours.

39.     The Court finds that Father is gainfully employed and living with his girlfriend and her two children. Father has two other children who do not reside with him.

40.     The Court finds that Father is fully aware of his court ordered obligations under the Dispositional Decree; however, he never completed his diagnostic assessment citing financial reasons despite the fact he is employed 56 hours per week as a carpenter. Father also claimed that he did not want to attend multiple sessions to complete the evaluation.

41.     The Court finds that although Father completed some portions of his diagnostic assessment, he has failed to sign a release to [DCS] so that those portions completed could be obtained.

42.  The Court finds that Father has not provided financial and/or material support for the child since the child has been placed under the supervision of [DCS]. . . .

***

45.  The Court finds that Father has not consistently participated in his therapeutic visitations[,] failing to participate in approximately twenty-five percent (25%) of his visitations. . . .

***

[Conclusions of Law]

***

3.  The Court concludes that the reasons for the child's placement outside of Mother and Father's care was primarily due to their drug use, incarcerations and inability and/or unwillingness to provide care and supervision. Due to the parents' failure to remedy the reasons for removal and continued placement outside of their care, the child continues to be placed in foster care.

4.  The Court concludes that although the child requires consistency and stability, Father . . . [has] been unable and unwilling to demonstrate an ability to provide this need to the child. Father has been inconsistent in his Court ordered therapeutic visitations over video conferencing. . . . Father has not even physically seen his child but for two times in the last three years despite an[] ability to do so. The Court concludes that . . . Father's failure to follow through in his services and visitations is

indicative of [his] instability and inability to remedy the reasons for the child's removal and his placement outside of their care. Further, the Court finds that as a result of . . . Father's failure to comply, the continuation of the parent-child relationship poses a threat to the well-being of the children [sic]. . . .

5.      . . . The Court concludes that the termination of parental rights and placement for adoption will provide the children [sic] with the nurturance[,] care and protection they [sic] require. It is therefore in their [sic] best interests that the petition to terminate parental rights be granted.

Appealed Order p. 10-13. Father now appeals.

# Discussion and Decision

## I. ICPC

First, we must evidently again address an issue that has already been decided by this Court. Just two years ago, this Court squarely held that "the ICPC *does not apply to placement with an out-of-state parent*." *D.B. v. Ind. Dep't of Child Servs.*, 43 N.E.3d 599, 604 (Ind. Ct. App. 2015) (emphasis added), *trans. denied*. Notwithstanding this unambiguous holding, apparently DCS is still requesting—and trial courts are still granting—ICPC evaluations for out-of-state parents.

DCS directs our attention to rules and regulations that have been promulgated under the ICPC by the Compact Administrator. Rules and regulations,

however, do not and cannot trump the plain statutory language enacted by our General Assembly. As we already held in *D.B.*:

> Article III of the ICPC sets forth the conditions for placement out of state:
>
> > (a) A sending agency may not send, bring, or cause to be sent or brought into any other party state *a child for placement in foster care or as a preliminary to a possible adoption* unless the sending agency complies with each requirement under article III and with the receiving state's laws governing the placement of children.
> >
> > (b) Before sending, bringing, or causing any child to be sent or brought into a receiving state *for placement in foster care or as a preliminary to a possible adoption*, the sending agency shall furnish the appropriate public authorities in the receiving state written notice of the intention to send, bring, or place the child in the receiving state. . . .
>
> I.C. 31-28-4-1 art. III (emphases added). Thus, the plain language of the statute makes clear that the ICPC applies only to the placement of a child in foster care or as a preliminary to a possible adoption.
>
> DCS contends that "the answer to the question of whether the ICPC applies is circumstantial in nature." Appellee's Br. p. 18. To the contrary, the answer to that question is *statutory* in nature. And the statute quite plainly provides that it applies only to placement in foster care or a preadoptive home. A biological parent is neither of these.

*Id.* (internal footnote omitted) (emphases original). So, yet again, we hold as plainly and unambiguously as possible: unless and until the statute is amended, the ICPC does not apply to placement with an out-of-state parent. To the extent that the termination order in this case relied on the rejected ICPC, we discount that basis of the ruling.

## II. Termination Order

[15] Father argues that there is insufficient evidence supporting the order terminating his relationship with Child. Our standard of review with respect to termination of parental rights proceedings is well established. In considering whether termination was appropriate, we neither reweigh the evidence nor assess witness credibility. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We will consider only the evidence and reasonable inferences that may be drawn therefrom in support of the judgment, giving due regard to the trial court's opportunity to judge witness credibility firsthand. *Id.* Where, as here, the trial court entered findings of fact and conclusions of law, we will not set aside the findings or judgment unless clearly erroneous. *Id.* In making that determination, we must consider whether the evidence clearly and convincingly supports the findings, and the findings clearly and convincingly support the judgment. *Id.* at 1229-30. It is "sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005).

[16]     Indiana Code section 31-35-2-4(b)(2) requires that a petition to terminate parental rights for a CHINS must make the following allegations:

(A)    that one (1) of the following is true:

   (i)     The child has been removed from the parent for at least six (6) months under a dispositional decree.

   (ii)    A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

   (iii)   The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B)    that one (1) of the following is true:

   (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

   (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii)  The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C)  that termination is in the best interests of the child; and

> (D)  that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1230.

## A.  Remedy of Conditions Resulting in Removal

[17]  Child was initially removed from Father's care and custody because at the time Grandmother was no longer able to care for Child, Father was incarcerated. Father is no longer incarcerated. Indeed, he has successfully completed probation and/or parole and has no remaining incarceration-related constraints on his life. *See K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 643 (Ind. 2015) (holding that "incarceration is an insufficient basis for terminating parental rights"). Furthermore, at the time of the hearing, Father had full-time employment—indeed, he had maintained full-time employment for over two years at the time of the termination hearing. He also had stable housing with room for Child should Child be placed in his care—and a bedroom for Child available in the residence of a cousin, should Child be placed in relative care.

[18]  Child's placement outside of Father's care and custody has continued because they are still forging a relationship, which is difficult when they live in two different states. Father admits that in the past, he was not nearly as involved

with Child as he should have been. As a result, they do not—yet—have a strong bond. But he has worked to better himself and, during the CHINS case, worked within his limitations to get to know Child. He participated regularly in telephone and Skype calls with Child. While his participation was not 100%, the record is undisputed that the reason for the handful of missed calls was technological difficulties. And his percentage of participation improved as the case progressed (presumably because all technological wrinkles were ironed out with time).

[19] DCS seeks to fault Father for being unable to visit Child in Indiana. But to be able to do so, Father would have had to jeopardize his employment. And while DCS blithely asserts that "a plane flight from Georgia to Indiana, with a several hour face-to-face visit could all be accomplished in one single day," DCS fails to acknowledge the exorbitant cost that such a trip would incur. Appellee's Br. p. 29. By expecting Father to accomplish tasks that are not realistic for most people, DCS set Father up to fail from the start.

[20] It is undisputed that at the time of the termination hearing, Father had successfully completed probation, was maintaining full-time employment, and had stable housing. *See In re D.D.*, 804 N.E.2d 258, 266 (Ind. Ct. App. 2004) (noting that the juvenile court must judge a parent's fitness to care for his child at the time of the termination hearing, taking into consideration evidence of changed conditions). He has done everything within his power to remedy the mistakes of the past and forge a bond with Child. Under these circumstances, there is not clear and convincing evidence supporting the trial court's

conclusion that there is a reasonable probability that the reasons for Child's placement outside of Father's care and custody will not be remedied.

## B. Threat to Child's Well-Being

[21] As the statute is phrased in the disjunctive, we must also consider whether DCS established by clear and convincing evidence that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being.

[22] The trial court found the following facts in support of its conclusion that Child's well-being was threatened: (1) Father was inconsistent in his participation with the Skype calls; (2) Father has only seen Child in person twice in the last three years; and (3) Father failed to follow through in his court-ordered diagnostic evaluation. Appealed Order p. 13.

[23] With respect to the Skype calls, Father participated in approximately 75% of those supervised interactions. It is undisputed that he missed the remaining calls because of technological difficulties. As time passed, his percentage improved. And the visitation supervisor testified that all interactions between Father and Child were "positive," that Child always "look[ed] forward to speaking with his father," that Child "want[ed] to be there," and that Child exhibited no inappropriate behavior following those calls. Tr. p. 19. The supervisor had no concerns about Father and Child being in each other's presence aside from the fact that they have had limited face-to-face interactions. *Id.* at 16, 19.

[24] With respect to Father's limited ability to interact with Child in person, we agree that this fact makes this case particularly challenging. But to terminate a parent-child relationship because a parent lives out of state, works full-time, and cannot afford to fly to another state and home again in the same day is to punish a parent for their geographic location and economic wherewithal. We decline to sanction this result.

[25] Finally, with respect to the diagnostic evaluation, we share Father's confusion about the process. We would have suspected that a diagnostic evaluation would be similar to Indiana's substance abuse assessments, which are a one- or, perhaps, two-session evaluation of the client, from which stems diagnoses and recommendations for further treatment. Father went in with the same understanding:

> it was supposed to be a one-time evaluation[.] I went and did it then they said it was the second part of the evaluation and I would be done[.] [T]hen they told me it was a third part of the evaluation and then a fourth part and possibly a fifth part . . . .

Tr. p. 79. They later said "they don't know" how many sessions there might be, telling Father "it could be probably seven or eight assessments . . . ." *Id.* at 160. Father was paying for this evaluation out of his own pocket; each time he went, he paid $300. He reached a point where he was both understandably frustrated by and suspicious of the process and where he was unable to afford to continue with it. DCS did not help Father, simply telling him that as it was out of state, there was no assistance that could be offered.

[26] While we acknowledge that Father did, in fact, fail to comply with this court order, under these circumstances, we do not believe that his failure to do so leads to a conclusion that there is a threat to Child's well-being if the relationship is continued. It is undisputed that Father was cooperative with DCS throughout the CHINS case, participated telephonically at all major hearings, and telephonically attended "any conferences [DCS] asked him to be a part of . . . ." *Id.* at 127. Consequently, although Father failed to complete the diagnostic evaluation, we see no evidence of a pattern of behavior demonstrating a lack of cooperation or any indication that he has not taken the process entirely seriously.

[27] Nothing in Father's current circumstances or behavior throughout the CHINS case suggests that Child's well-being is at risk if the relationship is maintained. In other words, we do not find that the record holds clear and convincing evidence of a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being.

## C. Best Interests

[28] Finally, we consider the general question of what is in Child's best interests. Stability and consistency are important for every child, and in this case, Father has not historically provided that. He made a series of compounding bad decisions over the years that led to a lack of a relationship with Child.

[29] But since he was released from incarceration in 2014, he has made every effort to better himself and become a suitable caregiver for his son. He has found and

maintained full-time employment, and has been successful enough that he is now on a path to management. He has stable housing and is even paying his cousin to rent a room in her house in case Child were to be sent to live in Georgia before it was recommended that Child be placed with Father. All of his interactions with Child have been positive, and Child has been eager for those to continue. The Family Case Manager testified that Father and Child have a good relationship: "they are able to talk about things [and] they are able to conversate and um [Child] does ask questions of his dad so yes I think that they are working on building a strong relationship." *Id.* at 136.

[30] Moreover, while Child has thrived in his foster care placement, at the time of the termination hearing, it was not at all clear that his foster mother intended to adopt him. Indeed, she has been "back and forth about her willingness to adopt" him. *Id.* at 65. More specifically, the Family Case Manager agreed that the foster mother has been unable to reach a decision: "the foster mom is yes I am no I'm not yes I am no I'm not because of the child's behavior issues[.]" *Id.* at 134. Essentially, whenever Child had behavioral issues, "the foster mom backs away about wanting to adopt him . . . ." *Id.* at 135. Consequently, it is not a given that the termination of the parent-child relationship would lead to stability, consistency, or permanency for Child.

[31] Child has a parent who, while living in a different state and having a history of poor choices, has made every effort to remedy the situation and become a suitable caregiver. Father *wants* to parent his son, and while they need more time—and geographical proximity—to further cement their relationship, we

simply cannot say that this record holds clear and convincing evidence that the termination of this relationship, at this point, is in Child's best interests.

[32] The judgment of the trial court is reversed and remanded.


Riley, J., concurs.
Brown, J., concurs in result without an opinion.