## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 31 2020, 7:23 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT FATHER

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEY FOR APPELLANT MOTHER

Amy Karozos
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of M.F. & P.F. (Children) and C.B. (Mother) & J.F. (Father);

C.B. (Mother) and J.F. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioners*

March 31, 2020

Court of Appeals Case No.
19A-JT-1931

Appeal from the Vigo Circuit Court

The Honorable Sarah K. Mullican, Judge

The Honorable Daniel Kelly, Magistrate

Trial Court Cause No.
84C01-1903-JT-340
84C01-1903-JT-341

**May, Judge.**

C.B. ("Mother") and J.F. ("Father") (collectively, "Parents") appeal the involuntary termination of their parental rights to M.F. and P.F. (collectively, "Children"). We consider four issues raised by the parties:

1. Whether the Department of Child Services presented sufficient evidence to support some of the trial court's findings;

2. Whether the trial court's findings support its conclusions that the conditions under which Children were removed from Parents' care would not be remedied or the continuation of the parent-children relationships poses a threat to Children's well-being;

3. Whether the involuntary termination of Father's parental rights to Children was in Children's best interests; and

4. Whether the trial court erred when it took judicial notice of the contents of the records in previous CHINS and termination of parental rights cases involving Children and their older siblings.

We affirm.

# Facts and Procedural History

Parents are the biological parents of M.F. and P.F., born September 7, 2016, and September 29, 2017, respectively. Parents' rights to their six other children, Je.F. Jr., Jay.F., Jar.F., C.F., Ky.F., and Ke.F. (collectively, "Older Siblings") were involuntary terminated in prior proceedings. Parents have a lengthy

history with the Department of Child Services ("DCS") that stretches back to 1999 and includes at least fourteen substantiations of neglect or abuse.

[3] In October 2015, Older Siblings were adjudicated as Children in Need of Services (CHINS) based on abuse and neglect in the home. Older Siblings remained in the home until they were placed in foster care on January 11, 2016, when Mother's adult child, B.F., reported that one of the Older Siblings had "sustained suspicious injuries." (DCS App. Vol. II at 19.) Older Siblings were returned to Parents for a trial home visit on January 26, 2017, where they joined M.F., who had recently been born.

[4] On May 2, 2017, DCS received a report that Father had hit Older Sibling Ja.F. and the child had a cut under his eye. On May 9, 2017, DCS received a report that Older Sibling C.F. had two black eyes and swelling on her face. On May 12, 2017, DCS received a report that C.F. also had a boil on her buttocks that was determined to be MRSA and a handprint mark on top of it. Based thereon, on May 12, 2017, DCS removed Older Siblings and M.F. from the home based on physical abuse allegedly perpetrated by Father.

[5] On May 16, 2017, DCS filed a petition alleging M.F. was a CHINS based on the physical abuse of his siblings. On September 12, 2017, the trial court held a factfinding hearing and adjudicated M.F. as a CHINS based on the multiple incidents of physical abuse involving Older Siblings, Parents' significant history with DCS, and Parents' lack of participation in services in the CHINS case involving Older Siblings. On October 10, 2017, the trial court held a

dispositional hearing regarding M.F. and on October 25, 2017, issued its dispositional order requiring Parents to engage in services including parenting assessments, random drug screens, psychological evaluations and counseling, domestic violence assessments, and visits with M.F.

On September 29, 2017, P.F. was born. On October 2, 2017, P.F. was removed from Parents' care based on the earlier incidents of abuse involving Older Siblings and the hospital staff's report of a lack of interaction between Parents and P.F. DCS filed a petition alleging P.F. was a CHINS on October 3, 2017. The trial court held a factfinding hearing regarding P.F. on April 24, 2018, and adjudicated P.F. as a CHINS on April 28, 2018, based on the earlier incidents of abuse involving Older Siblings and Parents' lack of participation in services in the CHINS cases involving Older Siblings. The trial court held a dispositional hearing on May 22, 2018, and entered its dispositional decree on June 1, 2018, which ordered Parents to participate in the same services ordered in the dispositional decree concerning M.F., as well as meeting with medical and psychiatric personnel and taking all medications as prescribed.[1]

Parents completed psychological evaluations, but neither followed through with the recommended treatment. Mother was diagnosed with major depressive disorder and mild intellectual disability. Father was diagnosed with adjustment

---

[1] On August 8, 2018, the trial court terminated Parents' parental rights to Older Siblings. Parents appealed, and we affirmed on May 15, 2019. *B.F. v. Ind. Dept. of Child Servs.*, 18A-JT-1967, 2019 WL 1217791 (Ind. Ct. App. 2019), *trans. denied*.

disorder, ADHD, and social anxiety disorder. Home-based counseling and supervised visitation were provided by the same service provider who had interacted with Parents in the Older Siblings CHINS proceedings. Parents had weekly supervised visits with Children and were provided extended visits with P.F. due to her young age. Parents asked that the extended visits with P.F. be reduced because the extra time with P.F. was "entirely too long." (TPR[2] Tr. Vol. II at 13.)

[8] Parents did not progress past supervised visits with Children. Parents were offered the opportunity for unsupervised visits contingent on Father's increased engagement and interaction with Children, but Father refused to engage with Children, especially P.F. Mother interacted well with the Children, but her progress with parenting skills was not consistent. Parents attended most visits, however, starting in November 2018, Mother missed nineteen visits and Father missed seventeen visits. Children's foster mother reported that P.F. would get "really anxious" after visits with Parents. (*Id*. at 73.) Foster mother also reported that M.F. would always need "more prompting" to engage in potty training following visits with Parents. (*Id*.)

[9] Parents' involvement in case management was "sparse." (*Id*. at 35.) Parents attended only one case management meeting after August 2018, when their parental rights to Older Siblings were terminated. Parents refused further case

---

[2] The Court Reporter filed two transcripts, one for the initial hearing in this case ("Initial Hearing Tr.") and one for the factfinding hearing in this case ("TPR Tr.").

management meetings and told the service provider "they felt like they didn't need any further help[.]" (*Id*.) The service provider attempted to provide the case management during visitation.

[10] From September 2018 to January 2019, Parents attended therapy to help them process the grief associated with losing their parental rights to Older Siblings and to assist with other coping skills. Parents attended eleven out of fifteen sessions. The therapist reported that Parents' "[p]rogress was very limited . . . [and] they did not really learn a lot of new coping skills but they did a lot of venting of frustrations." (*Id*. at 39.) The therapist testified that "most of the sessions focused on [Parents'] complaints about providers, DCS, the case in general and not a lot of focus on what they could do different. [sic] How they could make some changes." (*Id*. at 41.) Therapy was terminated in January 2019 because Parents "did not feel they needed therapy at the time" but DCS left the referral open "if they felt they wanted to pursue it later[.]" (*Id*. at 42.)

[11] The DCS Family Case Manager held regular team meetings. Father stopped attending team meetings in November 2018. Mother told the Family Case Manager that

> she was not real interested in the two little ones because she did not really know them that well and that really she wanted the bigger kids and not the little ones because she was around them more and had made some reference to that they were, the children in general, were, were like puppies and if she couldn't have one of them she didn't want any of them.

(*Id*. at 14.) On March 19, 2019, DCS filed petitions for the involuntary termination of Parents' parental rights to Children. The trial court held a factfinding hearing on the petitions on July 15, 2019, and issued an order terminating Parents' parental rights to Children on July 22, 2019.

# Discussion and Decision

[12] We review termination of parental rights with great deference. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge the credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

[13] "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A juvenile court must subordinate the interests of the parents to those of the child, however, when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837. The right to raise one's own child should not be terminated solely because there is a better home available for the child, *id*., but parental

rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id*. at 836.

[14] To terminate a parent-child relationship in Indiana, DCS must allege and prove:

> (A) that one (1) of the following is true:
>   (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>   (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>   (iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
> (B) that one (1) of the following is true:
>   (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>   (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>   (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. "[I]f the State fails to prove any one of these statutory elements, then it is not entitled to a judgment terminating parental rights." *Id.* at 1261. Because parents have a constitutionally protected right to establish a home and raise their children, the State "must strictly comply with the statute terminating parental rights." *Platz v. Elkhart Cty. Dep't of Pub. Welfare*, 631 N.E.2d 16, 18 (Ind. Ct. App. 1994).

# 1. Challenged Findings

When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

### a. Finding 2(f)(1) and 2(f)(21) Regarding Money Spent on Reunification

Parents challenge Finding 2(f)(1), which states, in part: "To-date, DCS has spent over Four Hundred Thousand Dollars ($400,000) in reunification services." (Appellants' Joint App. Vol. II at 65.) Mother also challenges a portion of Finding 2(f)(21), which relatedly states in part: "At the termination

hearing, the DCS attorney asked the current FCM about the extensive services that have been provided to this family, totaling in excess of Four Hundred Thousand Dollars ($400,000.00)." (*Id*. at 73.) Parents argue the findings referencing the amount allegedly spent to reunify the family is clearly erroneous, as it seems to "fault [P]arents for the amount of money spent by the [S]tate on a family when an affluent family would not be facing the same consequence." (Mother's Br. at 21.)

[17] In *In re Br.L.P.*, 91 N.E.3d 625 (Ind. Ct. App. 2018), our court spoke unfavorably of DCS's assertion that a father, who was on probation and attempting to secure stable employment in Georgia, should easily be able to afford a plane ticket from Georgia to Indiana to participate in visitation with his child. *Id*. at 632. In that case, the father "ha[d] done everything within his power to remedy the mistakes of the past and forge a bond with [his child]." *Id*. at 633. Based on that and other factors, our court reversed the termination of father's parental rights to his child. *Id*. at 634.

[18] While we agree that, like in *In re Br.L.P.*, the trial court's statement regarding the amount of money DCS has spent on reunification of this family is in poor taste and is not relevant to the factors for the involuntary termination of parental rights, the finding does not necessitate reversal in this case. Here, unlike in *In re Br.L.P.*, Parents have made very little progress in services and have done virtually nothing to remedy the situation that precipitated Children's removal. Thus, we conclude the finding was superfluous, and, again, while malapropos, not a reason for reversal. *See Lasater v. Lasater*, 809 N.E.2d 380,

397 (Ind. Ct. App. 2004) ("To the extent that the judgment is based on erroneous findings, those findings are superfluous and are not fatal to the judgment if the remaining valid findings and conclusions support the judgment.").

### b. Finding 2(f)(6)

[19] Parents challenge a portion of Finding 2(f)(6), which states: "The CHINS case on [M.F.] was dismissed on March 3, 2017[.]" (Appellants' Joint App. Vol. II at 71.) Parents argue the record is devoid of any information regarding a CHINS case involving M.F. prior to the CHINS adjudication which ultimately led to the termination proceedings we review here. The State agreed. However, this error is not a reason for reversal, because Parents do not challenge the rest of the finding, which outlines the events which led up to M.F.'s adjudication as a CHINS in this proceeding. Thus, the erroneous portion of this finding which states, "CHINS case on [M.F.] was dismissed on March 3, 2017" is superfluous and not reason for reversal. *See S.M. v. Elkhart Cty. Ofc. of Family & Children*, 706 N.E.2d 596, 598 (Ind. Ct. App. 1999) ("When a trial judge makes an erroneous fact finding that is superfluous to the judgement the error does not warrant reversal.").

### c. Finding 2(f)(9)

[20] Mother challenges Finding 2(f)(9), which states:

> Father generally came to supervised visits and case management sessions, which Mother missed a number of both, citing

employment conflicts, though DCS worked around Mother's schedule whenever she informed them of it. Between July 3, 2018 and the end of November of that year, Mother worked at least six different jobs, requiring DCS to constantly change visit times and disrupt the [C]hildren's schedules.

(Appellants' Joint App. Vol. II at 72.) Mother argues the evidence presented does not support this finding because she claims the evidence "showed that DCS worked about Mother's schedule only minimally." (Mother's Br. at 25.)

However, Family Case Manager William Welch testified at the factfinding hearing:

> [Welch]: . . . There were, she did miss more visits due to the fact that she had claimed she was frequently working. There were frequent job changes. So, there were a lot of times when she was unable or would not be able to attend. That went along with the case management. Typically, if [Mother] couldn't attend case management or therapy, [Father] would not attend those sessions either. So, there was [sic] a lot more misses for [Mother].
>
> [State]: Did the department try to accommodate her work schedule?
>
> [Welch]: They did. The visitations [sic] schedules were changed a couple of different times to the point that eventually it got to where it was just not productive to continue to change the routine for the [C]hildren because of the constant job changes. I believe during my extent [sic] on the case there were five different jobs. Correction, six different jobs that [Mother] had been involved with from July 3rd through the end of November.

(TPR Tr. Vol. II at 11-12.)  Mother's argument is an invitation for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do.  *See In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh evidence or judge the credibility of witnesses).

## 2. Reasonable Probability Conditions Not Remedied

The juvenile court must judge parents' fitness to care for their children at the time of the termination hearing.  *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010).  Evidence of a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services "demonstrates the requisite reasonable probability" that the conditions will not change.  *Lang v. Starke Cty. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

The trial court made several unchallenged findings regarding Parents' lack of progress to remedy the conditions under which Children were removed from their care, including:

> f.  There is a reasonable probability that the conditions which resulted in the removal of the [C]hildren from their [P]arents will not be remedied . . .
>
>> 1.  The family has a lengthy history of substantiations, including more than twenty separate substantiations, and a number of prior involuntary terminations. . . . Unfortunately, the evidence indicates that the circumstances that prevent reunification have only been marginally ameliorated and that the [P]arents are still unable to provide a safe home and to meet their [C]hildren's basic needs.

2.  The prior substantiations and issues included physical abuse of [Older Siblings], sexual molestation by a parent of [Mother's] other children, medical neglect, lack of verbal stimulation by [Father], resulting in the [C]hildren failing to develop speech skills, poor hygiene, lack of supervision, domestic violence in front of the [C]children, lack of intellectual capacity to parent, and on and on.

* * * * *

6. . . . DCS quickly received the following succession of reports of physical abuse:

- On May 2, 2017, DCS received a report alleged that [Ja.F.], age six, was a victim of physical abuse, with the perpetrator being [Father].  [Ja.F.] had a cut under his eye.

- On May 9, 2017, DCS received a report alleging that [C.F.], age 5, was the victim of physical abuse. She reportedly had two black eyes and swelling on her face which was confirmed by DCS.

- On May 12, 207 [sic], DCS received a report alleging that [C.F], age five, was the victim of physical abuse.  The child had a boil on her buttocks that appeared to have a handprint mark on top of it.

At this time, all of the children who were in the home were removed, including [M.F.], and new CHINS proceedings were initiated.  While those cases were pending with all children removed from the home, [P.F.] was born on September 29, 2017.  DCS received a report on October 1, 2017, alleging [P.F.] to be a victim of neglect.  There were

nine other children that had been removed due to concerns of domestic violence, medical neglect of the children and physical abuse. The report stated that the older children had special needs which were being neglected by the parents.

7. The [Family Case Manager, herein after "FCM"] went to the hospital to investigate this report. She observed that the baby, [P.F.], was in the crib in the hospital room and that neither parent interacted with her while the FCM was present, even when the baby began to make noises and move around in the crib.

8. Father initially showed up for most court-ordered services, but was not usually engaged in the services. He stopped attending team meetings. The parties have had numerous ups and downs in their relationship, including a series of break-ups and reconciliations. DCS instituted couples therapy, but those typically degenerated into the parties venting about the termination proceedings that were filed, and eventually granted, with regard to [Older Siblings].

* * * * *

10. Father would rarely speak or engage with the [C]hildren. He would occasionally interact minimally with [M.F.], while ignoring [P.F.] altogether.

11. A team meeting was held on July 30, 2018, with regard to [Children]. Despite termination proceedings involving [Older Siblings], [P]arents were insistent upon decreasing visits with [P.F.] from 3 ½ hours to 2 hours each. The FCM noted that the [P]arents seemed less invested in these [C]hildren than the ones for whom

termination was granted. When DCS met with Mother about a goodbye visit with [Older Siblings], she mentioned that she wasn't really interested in the two little children - [Children], because she didn't know them as well. She remarked that if she could not have all of her children, she didn't want any of them.

12. Mother advised DCS that she was unable to keep the visits scheduled for Friday because of a lack of transportation. The FCM pointed out that they had given her bus passes and the visits only required a walk of two blocks.

13. When Father visited [Children] in supervised visits, the supervisors typically described the visits as "destructive/limited," with no affection or verbal interaction displayed.

14. During the time that DCS was providing reunification services for [Children], [P]arents frequently commented that they did not need services and that the services were "worthless."

* * * * *

16. The evidence indicated that if the [C]hildren were returned to their [P]arents' home, they would likely be exposed to the dangers of physical abuse, neglect, ongoing domestic violence, and [P]arents with mental and psychological issues that prevent them from meeting their basic needs.

17. A service provider has been providing home-based case management to teach parenting skills, childhood

development, bonding, discipline, budgeting and organization. She also supervises visits. Although there was some progress noted by Mother, there was no progress with [Father], who would generally not even speak to the [C]hildren when prompted. [Mother] would show some progress in areas that were being addressed in case management sessions, but would rarely carry out those skills beyond the next couple of visits before regressing again. She struggled with consistency in discipline and redirection and in implementing basic parenting skills. The case manager would try to convey lessons in a variety of ways, including by writing down instructions, discussing them, drawing pictures and modeling.

18. Therapy was set up for the [P]arents to learn coping skills and to deal with the grief of the termination of their rights to [Older Siblings]. The [P]arents only attended about 75% of their therapy sessions, which were closed out when the [P]arents told the therapist they didn't need therapy. The therapist testified that she made "very minimal, if any progress" in getting the [P]arents to focus on [Children] rather than obsessing on the ones for which termination had already been granted.

19. A case manager from Raintree Consulting took over supervision of visits beginning in November 2018. During those twice per week visits, Mother missed 19 visits. She interacted with the [C]hildren reasonably well during the visits she attended. Father was observed interacting slightly with [M.F.], while ignoring [P.F.], refusing to even greet her at the beginning and end of visits. This consultant saw no improvement in parenting skills during her time on the case.

20. A family team meeting was held on January 14, 2019, at which the [P]arents informed DCS that they saw no

need to engage in services, and since that time have engaged in no services other than supervised visits.

21. At the termination hearing, the DCS attorney asked the current FCM about the extensive services that have been provided to this family . . . . Despite the Department's diligent efforts to afford reunification services following involuntary terminations, each of the "CHINS circumstance" set forth in the court's order of October 5, 2017, finding the [C]hildren to be CHINS were still present, nearly two years later, including the following:

> a. Mother and Father have participated in, but not engaged or implemented the skills learned in these services.

> b. Mother and Father display a lack of parenting skills that is accentuated by Father's lack of engagement.

> c. This lack of parenting skills creates safety and behavioral concerns in the [C]hildren, and specifically, [contributes] to the developmental issues.

> d. The [Children's] physical and mental condition is impaired by Mother and Father failing to supply adequate supervision stemming from overall neglect.

(Appellants' Joint App. Vol. II at 65-74.) Parents do not challenge these findings, and thus they stand proven. *See Madlem v. Arko*, 592 N.E.2d 686, 687

(Ind. 1992) ("Because Madlem does not challenge the findings of the trial court, they must be accepted as correct.").

[24] Mother argues simply that the trial court's findings do not support its conclusion that the conditions under which Children were removed from her care would not be remedied. As indicated in the unchallenged findings *supra*, there is an overwhelming amount of evidence that Mother did not engage in services; when she did engage in services, she did not implement any of the skills taught; and eventually declined services. Mother would not address Father's treatment of Children and the couple did not progress in couples' therapy. Thus, we conclude that the trial court's unchallenged findings support its conclusion that the conditions under which Children were removed from Parents' care would not be remedied. *See Lang*, 861 N.E.2d at 373 (affirming termination of father's parental rights to his children based on father's lack of cooperation in services ordered to address his unreasonable corporal punishment of children).

[25] Father argues DCS did not present evidence regarding his ability to parent at the time of the termination hearing, however, there are a plethora of findings that illustrate the Father's pattern of behavior and unwillingness to properly parent Children or engage in services to assist him in doing so. Father contends that, had he been given an opportunity to parent Children, he would have done so appropriately. There is no evidence to support his statement, and the "trial court need not wait until a child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the

parent-child relationship." *McBride v. Monroe Cty. Ofc. of Family & Children*, 798 NE.2d 185, 199 (Ind. Ct. App. 2003).[3]

## 3. Children's Best Interests

In determining what is in Children's best interests, a trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. dismissed.* A parent's historical inability to provide a suitable environment, along with the parent's current inability to do so, supports finding termination of parental rights is in the best interests of the child. *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002). The recommendations of a DCS case manager and court-appointed advocate to terminate parental rights, in addition to evidence that conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in Children's best interests. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

Mother does not make an argument regarding Children's best interests. Father argues termination of his parental rights is not in Children's best interests

---

[3] Parents also allege the trial court's findings do not support its conclusion that the continuation of the parent-children relationships posed a threat to Children's well-being. Because we hold the trial court's findings supported its conclusion that the conditions under which Children were removed from Parents' care would not be remedied, we need not consider Parents' argument regarding whether the continuation of the parent-children relationships poses a risk to the Children's well-being. *See In re L.S.*, 717 N.E.2d 204, 209 (Ind. Ct. App. 1999) (because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the court need find only one requirement to terminate parental rights), *reh'g denied, trans. denied, cert. denied* 534 U.S. 1161 (2002).

because the limitations in DCS services did not give him an opportunity to properly bond with his Children, specifically because "Father was only permitted to visit with P.F. twice per week in a small office while being supervised. The conditions were less than ideal to establish a bond." (Father's Br. at 24.) However, any deficiencies in services as part of the CHINS proceedings is not a basis to attack a termination order. *In re J.W., Jr.*, 27 N.E.3d 1185, 1190 (Ind. Ct. App. 2015), *trans. denied*. Furthermore, when the findings indicate Father did not even acknowledge P.F.'s existence when provided with an opportunity to establish a bond with her, we find his argument about needing additional opportunities to be disingenuous.

[28] The FCM testified she believed that placement with Children's foster parents should continue and answered in the affirmative when asked if Parents' parental rights should be terminated. In a report from February 21, 2019, the CASA stated that "[i]t would be in the [C]hildren's best interest[s] for the DCS to start the termination of parental rights process." (Ex. Vol. I at 218.) These statements and the findings discussed in this opinion support the trial court's conclusion that termination of Father's parental rights would be in Children's best interest. *See In re T.F.*, 743 N.E.2d 766, 776 (Ind. Ct. App. 2001) (testimony of guardian ad litem and caseworker sufficient to support trial court's findings and conclusion that termination was in child's best interests), *trans. denied*.

# 4. Due Process – Judicial Notice

[29] In a termination of parental rights proceeding, parents have certain due process rights:

> When a State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of the due process clause. *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982). Although due process has never been precisely defined, the phrase embodies a requirement of "fundamental fairness." *E.P. v. Marion County Office of Family & Children*, 653 N.E.2d 1026, 1031 (Ind. Ct. App. 1995) (quoting *Lassiter v. Dep't of Social Servs.*, 452 U.S. 18, 26, 101 S. Ct. 2153, 68 L.Ed.2d 640 (1981).

*J.T. v. Marion Cty. Office of Family & Children*, 740 N.E.2d 1261, 1264 (Ind. Ct. App. 2000), *reh'g denied, trans. denied, abrogated on other grounds by Baker v. Marion Cty. Office of Family & Children*, 810 N.E.2d 1035, 1041 (Ind. 2004) (abrogation based on underperformance of counsel). Parents argue the trial court violated their due process rights by taking judicial notice of the contents of the records in CHINS and termination cases involving Older Siblings.

### *a. Standard of Review*

[30] We review the trial court's decision to take judicial notice of information for an abuse of discretion. *Horton v. State*, 51 N.E.3d 1154, 1157 (Ind. 2016). The conditions under which a trial court can take judicial notice is governed by Indiana Evidence Rule 201 which states, in relevant part:

> (a) **Kinds of Facts That May Be Judicially Noticed**. The court may judicially notice:

(1) a fact that:

> (A) is not subject to reasonable dispute because it is generally known within the trial court's territorial jurisdiction, or

> (B) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

(2) the existence of:

> (A) published regulations of governmental agencies;

> (B) ordinances of municipalities; or

> (C) records of a court of this state.

* * * * *

(c) **Taking Notice**.  The court:

> (1) may take judicial notice on its own; or

> (2) must take judicial notice if a party requests it and the court is supplied with the necessary information.

(d) **Timing**.  The court may take judicial notice at any stage of the proceeding.

(emphasis in original).

"For years, [Evidence] Rule 201 did not permit a trial court to take judicial notice of court records, even if they were 'its own records in another case previously before the court on a related subject with related parties.'" *Horton*, 51 N.E.3d at 1157 (quoting *Gray v. State*, 871 N.E.2d 408, 413 (Ind. Ct. App. 2007), *trans. denied*.) However, in 2010, our Indiana Supreme Court amended Indiana Evidence Rule 201 to the version active during the time period relevant to this case, which permits courts to take judicial notice of the records of a court of this state. *Id*. at 1160. Parents do not dispute that the trial court could take judicial notice of the existence of records in the involuntary termination of parental rights cases involving Older Siblings; instead, Parents argue the trial court was not permitted to take judicial notice of the facts in those records.

### b. Findings from Prior CHINS and Termination Adjudications

During the termination fact-finding hearing, the State asked the trial court to take judicial notice of the CHINS and termination orders involving Older Siblings. Parents did not object to the court taking judicial notice of these items. These challenged findings encompass Finding 2(f)(3):

> 3. The court was asked in these proceedings to take judicial notice of the CHINS and TPR cases of the [P]arents' older children.
>
> Among the findings in those prior involuntary terminations were the following:
>
>> a. Mother's intellectual functioning is very low . . . Mother's longtime boyfriend ([Father]) and father of the

younger children . . . has evidently established a pattern of extremely inadequate verbal communication, both with Mother, the children, service providers and the world. This results in far too little verbal stimulation by the numerous children's primary caregiver, who generally cares for all of the kids when Mother works to support the family. In addition, the evidence unmistakably points to [Father] having serious and persistent anger control issues. [Mother's] adult daughter testified credibly that all of the children were subjected to physical abuse by [Father] and that physical abuse of the children and domestic violence occurred in the home on a virtually daily basis over a period of years.

[TPR order of 8-7-2018 in Cause No. 84C01-1710-JT-1441].

b. Further complicating the anger control, physical abuse and domestic violence problems is the fact that, even after working with service providers inside the home and out for three years, Mother, [Father], [and] [Father's] grandmother all remain in complete denial about these obvious and serious issues, rendering a remediation of those problems all but impossible.

[TPR order of 8-7-2018 in Cause No. 84C01-1710-JT-1441].

c. Finally, the condition of all of the children before removal compared to their present levels of functioning presents an almost unbelievable contrast.

[TPR order of 8-7-2018 in Cause No. 84C01-1710-JT-1441].

d. Despite a number of services being in place following the dispositional order, the Department continued to receive a number of reports of physical abuse and domestic violence in the home. In one such report, [Je.F. Jr.] was

observed to have a large "goose egg" bump on his head. While Mother claimed that the injury occurred when [Je.F. Jr.] and a brother were "roughhousing," the other children reported to DCS that they saw [Father] throw [Je.F. Jr.] into a dresser.
[TPR order of 8-8-2018 in Cause Nos. 84C01-1710-JT-1442 through 1447].

e. On May 12, 2017, all children were again removed when new reports were received. [C.F.], who previously had a suspicious black eye that was already being investigated, now had marks on her buttocks consistent with physical abuse. At this time, the children disclosed that [Father] beats the younger children "because they will not listen."
[TPR order of 8-8-2017 in Cause Nos. 84C01-1710-JT-1442 through 1447].

f. Throughout the life of the Child In Need of Services proceedings, there has been a pattern whereby Mother engages in services and is largely compliant, but fails to implement that which she has been taught through services. Through testing that was done as part of a psychological evaluation, DCS determined that Mother's intellectual functioning is extremely limited. Her IQ score of 63 on the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV) places [Mother] in the "extremely low range" of intellectual functioning for her age. Psychologist Dr. Leah Powell found these results to be an accurate reflection of Mother's current level of cognitive functioning. Dr. Powell also found that Mother appeared to be sad most of the time. She reported feeling generally unlucky. She also felt a need to "protect" her children, rather than allowing them the independence necessary to become autonomous.

[TPR order of 8-8-2018 in Cause Nos. 84C01-1710-JT-1442 through 1447].

g. When DCS became involved with the family in 2015, all of the children six years old and under were still in diapers and were non-verbal. The court concludes from the evidence that the children's inability to speak was the result of a combination of untreated hearing loss, cognitive impairment and lack of verbal and intellectual stimulation in the home. When Mother worked outside of the home, [Father] was a primary caregiver for all of the children. He was described by virtually every witness who interacted with him as extremely quiet and frequently sullen. Poor anger management also appears to be a strong aspect of his personality, as he would frequently abuse Mother and various children in the home. Whether it was due to Mother's own limited intellectual functioning, a consequence of being a victim of abuse, her dependence upon his help with the children or a combination of these factors, Mother refused to leave [Father], and by the time of the termination hearing was denying that he was abusive to her or the children, claiming that DCS put the notion of abuse in the children's heads. Therefore, in addition to concerns about her cognitive functioning making it difficult to parent a large number of children in the home and to deal effectively with the children's numerous medical and educational needs, the evidence indicates that Mother cannot keep the children safe from physical abuse and domestic violence.
[TPR order of 8-8-2018 in Cause Nos. 84D01-1710-JT-1442 through 1447].

h. Despite the continuing threat that [Father's] presence in the home posed to all of the children, [Father] was generally non-communicative, non-participatory in services, and quick to angry outbursts. [Father] refused to

talk to DCS case managers, telling at least one of them that they needed to communicate to him through [Mother]. In family team meetings, both parents would often get so angry that DCS was unable to conduct the meeting.
[TPR order of 8-8-2018 in Cause Nos. 84C01-1710-[JT]-1442 through 1447].

11. [sic[4]] Mother would often show up to supervised visits crying, having been in a fight with [Father]. Their poor relationship, characterized by frequent arguing and physical altercations, remained a significant obstacle to reunification throughout the duration of the case. When the kids were home on a trial home visit, the children saw [Father] grab Mother by the shirt and throw her against a wall. [Mother] rationalized [Father's] abuse, saying that he hits her because she doesn't give him enough breaks with the kids and he takes his frustration out on her.
[TPR order of 8-8-2018 in Cause Nos. 84C01-1710-JT-1442 through 1447].

12. [sic] Although service providers pushed [Father] to obtain a driver's license so that he could help [Mother] transport the children to their many doctor and therapy appointments, he has still never obtained a driver's license. His intellectual functioning is in the low-average range. Although he would feed the children and change their diapers during supervised visits, he rarely displayed affection toward the children.

---

[4] It seems there was a numbering error within these findings, as there exists a Finding 11 and 12 in the midst of lettered findings.

[TPR order of 8-8-2018 in Cause Nos. 84C01-1710-JT-1442 through 1447].

i. Eighteen-year-old [As.F.] credibly testified to daily abuse of the children by her stepfather [Father]. She also frequently saw him abuse her mother. When the children were in the care of [Father], they would sometimes miss meals and she generally felt unsafe. She strongly believes that parental rights should be terminated.
[TPR order of 8-8-2018 in Cause Nos. 84C01-1710-JT-1442 through 1447].

j. As a consequence of their educational and medical needs, all of the children at issue require more care than typical children, but due to parents' limitations and the sheer number of children involved, as well as transportation issues, the parents simply cannot meet those needs for the children. During a trial home visits [of the older children], regression in a number of areas was noted for the children, after progress had been made in foster care. The children gradually became more out-of-control. [A service provider] had to frequently prompt [Father] to intervene in the children's fighting. During one supervised visit, some of the children ran outside in the parking lot in the rain. At the present time, [Mother] and [Father] are still just receiving visits of one hour, once a week. When the visits have been extended beyond that, the parents became overwhelmed. The pattern of progress upon their subsequent removal to the present time has been clearly established, similarly to that which occurred from initial removal to the failed trial home visit.
[TPR order of 8-8-2018 in Cause Nos. 84C01-1710-JT-1442 through 1447].

k. After extensive services for nearly three years, the in-home caseworker from Raintree Consulting, who worked

on parenting, tutoring, supervised visitation, home organization and linked the family to resources, felt that no progress had been made with [Mother] and [Father]. She testified that the children made progress following removal on their ability to speak, using the bathroom, etc. [TPR order of 8-8-2018 in Cause Nos. 84C01-1710-JT-1442 through 1447].

(Appellants' Joint App. Vol. II at 65-70) (footnote added). Parents argue the trial court abused its discretion when it took judicial notice of the findings from the orders in the termination cases involving Older Siblings.

[33] In support of their individual arguments, Mother and Father both cite cases that were decided prior to the 2010 amendment to Indiana Evidence Rule 201. *See Brown v. Jones*, 804 N.E.2d 1197, 1202 (Ind. Ct. App. 2004), *trans. denied*, *superseded by statute as noted in Matter of D.P.*, 72 N.E.3d 973, 983 n.3 (Ind. Ct. App. 2017) (holding court could not take judicial notice of its order dissolving the relevant corporation, as it included finding regarding alleged conversion); *see also Patterson v. State*, 659 N.E.2d 220, 223 (Ind. Ct. App. 1995) (trial court could not take judicial notice of statements of a doctor who treated Patterson filed in an underlying criminal case to determine Patterson's mental condition).

[34] In *Matter of D.P.*, our court examined the amended version of Indiana Evidence Rule 201. 72 N.E.3d 976, 982 (Ind. Ct. App. 2017). In that case, DCS alleged D.P. was a CHINS based, in part, on D.P.'s father's alleged substance abuse. D.P.'s father did not attend the CHINS fact finding hearing because allegedly he was incarcerated. During that hearing, DCS sought admission of evidence

of the father's drug use, but the trial court sustained proper objections to their admission. *Id.*

[35] In its order adjudicating D.P. as a CHINS, the trial court stated it was taking judicial notice of preliminary "reports and other filings during the course of the proceedings" and some of those reports "referenced Father's drug use." *Id.* Absent other evidence to support the trial court's finding that D.P.'s father abused illegal substances, we concluded

> it would stretch the concept of judicial notice too far to allow the contents of the previous filings in this case to be accepted as substantive evidence. . . . [I]f a trial court hearing a CHINS matter could simply rely upon the facts alleged in such preliminary filings, it would seem to obviate the need for a fact-finding hearing.

*Id.* at 982-3.

[36] Here, however, the trial court took judicial notice of the entire record in the prior CHINS and termination proceedings, but only used the findings in the trial court's own termination order to support its termination of Parents' parental rights to Children. The trial court's own order is a not pleading or filing, but a final judgment set forth by the trial court to address all issues before it. Thus, our court's holding in *Matter of D.P.* is distinguishable because the documents judicially noticed in that case were preliminary reports by a party to the litigation.

[37] Under Indiana Evidence Rule 201(b)(5), the trial court may judicially notice "records of the court of this state." Judicial notice "'encompasses facts ascertainable from sources that cannot reasonably be questioned, and presumably court records are such sources,' in the absence of evidence tending to rebut that presumption." *Horton*, 51 N.E.3d at 1161 (quoting *Brown*, 804 N.E.2d at 1202). Here, the court took judicial notice of its own previous orders after those orders had been affirmed on appeal by this court. *See B.F.*, 18A-JT-1967, slip op. at *6 (affirming involuntary termination of Parents' parental rights to Older Siblings; holding the trial court's findings supported its conclusions that there was a reasonable probability that the conditions that resulted in Older Siblings' removal would not be remedied and termination was in Older Siblings' best interests). Based thereon, we conclude the findings included in the order "cannot be reasonably questioned."[5]

---

[5] Parents also argue their due process rights were violated because the trial court relied primarily on findings from Older Siblings' termination cases, and thus the court subjected them to an irrebuttable presumption of parental unfitness. We disagree. The termination order was eleven pages long, with approximately four pages of history, which included findings from the Older Siblings' termination order. As we have concluded the trial court was permitted to take judicial notice of the facts in those orders, and the findings show a habitual pattern of conduct by Parents, which the trial court supplemented with multiple pages of findings regarding the events leading up to the current termination and Parents' lack of participation in services, we reject Parents' argument. *See Bester v. Lake Cty. Ofc. of Family and Children*, 839 N.E.2d 143, 152 (Ind. 2005) (trial court "must evaluate parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child"); *see also Matter of Eq.W.*, 124 N.E.3d 1201, 1210-11 (Ind. 2019) (evidence of parents' prior experiences with DCS, including CHINS adjudications, is relevant "to all potential future CHINS proceedings involving the parents and children").

### c. *Report from Prior Court-Appointed State Advocate*

[38]  In its order, the trial court also referenced a report made as part of a previous CHINS case involving M.F. by a prior Court-Appointed Special Advocate (CASA) which was judicially noticed by the trial court at the State's request. The trial court's finding stated:

> 5.  Although the instant termination proceedings with respect to [M.F.] have arisen from a CHINS case with the Cause No.84C01-1705-JC-690 [sic], [M.F.] was previously the subject of a CHINS action under Cause NO. 84C01-1609-JC-104. The CASA wrote the following in a report filed in that case on February 20, 2018:
>
>> We encourage the court to follow the permanency plan DCS has in place for [Older Siblings] ([termination of parental rights] and adoption). The environment being created by both parents is volatile at this present time. [T]hey continue to make very bad decisions regarding the ability to provide any kind of safe and nurturing environment. Neither parent has completed their psychological evaluation as requested by DCS. [Mother] continues to make poor choices that will affect the children if the children were ever allowed to return home. We have observed several family visitations and read reports following other visitations we did not attend. These visits are chaotic and sometimes disruptive to the children's daily routines. What the children do on a day-to-day basis oftentimes needs to be changed to accommodate the parents' schedules. Neither parent has complied with DCS's request for psychological evaluations and based upon social media, [Mother] has absolutely no respect for this court system or the process to comply in order to ever have any hope of reconciliation with her children. Foster care is the most nurturing and loving environment for all

these children.  Going forward, we encourage Termination
of Parental Rights and Adoption for all the children
(exception – A.F. [Mother's older child] who is going into
collaborative care).

(Appellants' Joint App. Vol. II at 70) (emphasis in original omitted).  Parents

do not challenge the trial court's judicial notice of the existence of the CASA

report from M.F.'s earlier CHINS case; instead they challenge the trial court's

use of the contents of the CASA's report in the order terminating Parents'

parental rights to Children.

[39]     The trial court here did not use the CASA's statement as a substantial part of

the evidence to support its decision, as the trial court did in *Matter of D.P.*, 72

N.E.3d at 983.  Thus, as we have affirmed the trial court's other findings and

conclusions, we conclude the trial court did not err when it took judicial notice

of the statements within the CASA's report because there existed substantial

independent evidence to support the trial court's decision to involuntarily

terminate Parents' parental rights to Children.

# Conclusion

[40]     DCS presented sufficient evidence to support challenged Finding 2(f)(9).  The

parties agreed a portion of Finding 2(f)(6) was not supported by the evidence

and we concluded it was inappropriate for the trial court to, in Findings 2(f)(1)

and 2(f)(21), cite the amount of money DCS had expended on services for

reunification of this family over the years.  However, the erroneous portions of

Findings 2(f)(6), 2(f)(1), and 2(f)(21) are superfluous and not a basis for reversal. Further, the trial court's unchallenged findings support its conclusion that the conditions under which Children were removed from Parents' care would not be remedied and that termination of Father's parental rights were in Children's best interests. Finally, the trial court did not violate Parents' due process rights when it took judicial notice of its own records and included portions of those records in the findings of the termination order before us now. Accordingly, we affirm.

[41] Affirmed.

Crone, J., and Pyle, J., concur.